## Richmond

Infants, and Other Persons Under Disability, etc., et al.

v.

Virginia Housing Development Authority, et al.

November 26, 1980.

Record No. 791533.

Present: Carrico, Harrison, Cochran, Poff, Compton and Thompson, JJ.

J. *Durwood Felton, III* (*Felton & Fagan,* on brief), for appellants.
*Lee F. Davis, Jr.* (*A. J. Brent; William B. Cave; Christian, Barton, Epps, Brent & Chappell,* on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

In 1979, the General Assembly amended the Virginia Housing Development Authority Act, Code §§ 36-55.24 to 36-55.52, to empower appellee Virginia Housing Development Authority to finance housing, under limited circumstances, for persons and families of "other" than low and moderate income. In this bond validation proceeding instituted under Code § 15.1-214, the principal issue on appeal is whether the purposes supporting such financing are permissible public purposes under the Constitution of Virginia.

The Authority initiated this litigation in the court below to validate a proposed bond issue in the principal amount of $10 million, the proceeds of which will be used to finance the construction of multi-family housing permitted to be financed under the aforesaid Act as amended. The bonds are sanctioned by an Authority resolution, adopted June 19, 1979, entitled "A Resolution Authorizing the Issuance of Housing Bonds (Portsmouth) of the Virginia Housing Development Authority and for the Rights of the Holders Thereof."

After a reply raising certain constitutional objections had been filed, Code § 15.1-217, by a duly appointed guardian ad litem for infant defendants and other defendants under disability, and after a hearing, the trial court determined that the bonds should be validated. We granted defendants' appeal, filed under Code § 15.1-219, to the October 1979 final order below.

The Authority was created by the General Assembly in 1972 in

response to the findings of a legislative Housing Study Commission, which had completed a review of housing needs in the Commonwealth. The study group recommended that a housing finance agency be established to stimulate, through low interest loans, the production of housing for low and moderate income persons within the State.

The Authority is not an agency within the State government but was created as a political subdivision of the Commonwealth; it is "a public instrumentality exercising public and essential governmental functions." Code § 36-55.27. The enabling legislation confers on the Authority, *inter alia,* the power to sue and be sued, the power to contract, the power to buy, sell and lease real property, and the power to borrow money and issue bonds. Code § 36-55.30. The Authority's major function is to attract capital, through the sale of tax-exempt bonds and notes, and to then utilize the proceeds to make mortgage loans for the development of rental and "ownership housing" for low and moderate income persons. *1979 Annual Report of the Virginia Housing Study Commission Reported to the Governor and The General Assembly of Virginia,* H. Doc. No. 24 at 25, 2 House and Senate Documents, 1980 Sess.

Under Code § 36-55.41, the Authority is authorized to establish one or more special funds, called "capital reserve funds," to be pledged as security for repayment of the bonds. The Capital Reserve Funds consist of any moneys appropriated or made available by the Commonwealth, any proceeds of sale of notes or bonds, and any "other" sums made available to the Authority for such fund. Under the Resolution, a Capital Reserve Fund is established for the present issue.

Prior to 1978, the purposes of the Act were limited to meeting the needs of low and moderate income families. In 1978, the General Assembly amended the Act by adding Code § 36-55.30:1 to permit the Authority to exercise its power "to increase the availability of housing to persons of all economic income and wealth levels." Acts 1978, ch. 508. The application of that amendment was limited to the City of Portsmouth.

In 1979, the 1978 amendment was repealed by a further amendment. Acts 1979, ch. 374. Under the Resolution in this case, the bonds at issue here are authorized solely for the purpose of making loans to finance developments pursuant to the 1979 amendment. That amendment, *inter alia,* made extensive changes in Code § 36-55.25 which sets forth the legislative findings and declaration of necessity; it also added § 36-55.30:2 to the Act. These changes appear in italics and by strikeovers as follows:

§ 36-55.25. Finding and declaration of necessity.—It is hereby declared: (a) that there exists within this Commonwealth a serious shortage of sanitary and safe residential housing at prices or rentals which persons and families of low and moderate income can afford; that this shortage has contributed to and will contribute to the creation and persistence of substandard living conditions and is inimical to the health, welfare and prosperity of the residents of this Commonwealth; (b) that it is imperative that the supply of residential housing for such persons and families and for persons and families displaced by public actions or natural disaster be increased; (c) that private enterprise and investment have been unable, without assistance, to produce the needed construction or rehabilitation of sanitary and safe residential housing at prices or rentals which persons and families of low and moderate income can afford and to provide sufficient long-term mortgage financing for residential housing for occupancy by such persons and families; (d) *that a concentration of persons and families of low and moderate income even in standard structures does not eliminate undesirable social conditions; (e) that the governing body of a city may in its discretion determine that it is necessary to the preservation of the financial viability of such city and the health, welfare and prosperity of its residents that the population of such city be maintained as economically mixed by providing housing for persons and families of other than low and moderate income in order to broaden the tax bases of such areas; (f) that in providing sanitary and safe residential housing at prices or rentals which persons and families of low and moderate income can afford it may at times be necessary or desirable to provide housing for persons and families of other than low and moderate income; and (g)* that private enterprise and investment be encouraged both to sponsor land development and build and rehabilitate residential housing for such persons and families *of low and moderate income and to build housing which will prevent the recurrence of slum conditions by housing persons of varied economic means in the same projects or area,* and that private financing be supplemented by financing as provided in this chapter in order to help prevent the creation and recurrence of substandard living conditions and to assist in their permanent elimination throughout Virginia.

It is further declared that in order to provide a fully adequate supply of sanitary and safe dwelling accommodations at rents,

prices, or other costs which such persons or families can afford *and to stabilize or recover a necessary economic mix in urban, areas* the legislature finds that it is necessary to create and establish a State housing development authority for the purpose of encouraging the investment of private capital and stimulating the construction and rehabilitation of residential housing to meet the needs of such persons and families *or to stabilize such areas* through the use of public financing, to provide construction and mortgage loans and to make provision for the purchase of mortgage loans and otherwise.

It is hereby further declared to be necessary and in the public interest that such State housing development authority provide for predevelopment costs, temporary financing, land development expenses and residential housing construction or rehabilitation by private sponsors for sale or rental to persons and families of low and moderate income *and others;* further, to provide mortgage financing *for the purposes of supplying sanitary and safe dwelling accommodations at rents, prices or other costs which such persons or families can afford or of stabilizing urban areas,* including without limitation, long-term federally insured mortgages; further, to increase the construction and rehabilitation of low and moderate income housing through the purchase from mortgage lenders authorized to make loans in the Commonwealth of mortgage loans for residential housing for persons and families of low and moderate income in this Commonwealth; further, to provide technical, consultative and project assistance services to private sponsors; further, to assist in coordinating federal, State, regional and local public and private efforts and resources; to guarantee to the extent provided herein the repayment of certain loans secured by residential mortgages; and further, to promote wise usage of land and other resources in order to preserve the quality of life we value so highly in Virginia.

~~Under certain extraordinary conditions as specified in § 36-55.30:1 the HDA may vary from the intent of the preceding findings and declarations.~~

It is hereby further declared that all of the foregoing are public purposes and uses for which public moneys may be borrowed, expended, advanced, loaned, or granted, and that such activities serve a public purpose in improving or otherwise benefiting the people of this Commonwealth; that the necessity of enacting the provisions hereinafter set forth is in the public interest and is

hereby so declared as a matter of express legislative determination.

§ 36-55.30:2. *Housing Rehabilitation Districts; Economically Mixed Projects.*—(a) *Whenever it appears to the governing body of any city that a portion of such city (i) is blighted or deteriorated, as provided in § 36-49(1), (ii) is deteriorating, as provided in § 36-49.1, (iii) is likely to deteriorate, as provided in § 36-52.3, or (iv) is characterized by a higher relative density of population and proportion of substandard housing than in the overall metropolitan area and inhabited predominantly by persons of a lower socio-economic status than that prevailing in the metropolitan area, and in any such case that private enterprise and investment may not be expected, without assistance, to produce the construction or rehabilitation of sanitary and safe housing to meet the needs of persons and families of low and moderate income within such area and to induce other persons to live within such area and thereby help to stabilize or recover a desirable economic mix of persons therein, such governing body may by resolution create a housing rehabilitation district encompassing such portion of such city.*

*(b) If any such governing body shall determine that a proposed housing project, within or without a housing rehabilitation district, if any, may feasibly serve persons and families of low and moderate income only by effectively subsidizing the rentals of such persons and families through higher rentals charged to other persons or that, for any other reason, such proposed project is feasible only if a portion, not to exceed eighty percent, thereof is to be rented to persons other than persons and families of low and moderate income, it may by resolution declare such proposed project an economically mixed project.*

*(c) Any such governing body shall appoint a board of five persons, all of whom shall be residents of the city and at least four of whom shall be representatives of savings and loan associations, commercial banks and mortgage bankers, which shall evaluate the ability of private enterprise and investment, without assistance, to meet the needs of persons and families of low and moderate income within any proposed housing rehabilitation district and to induce other persons to live within such proposed district. No housing rehabilitation district shall be created, nor any proposed project declared an economically mixed project, by the governing body of any city unless such board, by a majority vote of at least*

> *three members, shall have first determined, in the case of a housing rehabilitation district, that private enterprise and investment may not reasonably be expected to meet such housing needs and induce persons with higher incomes to live within the proposed district or, in the case of an economically mixed project, that private enterprise and investment have been unable, without assistance, to provide sufficient mortgage financing for the proposed project at interest rates producing rentals which persons or families of low and moderate income can afford. Unless the board shall reaffirm its determination after four years from the date of its previous determination, then the status of any area as a housing rehabilitation district shall terminate on the fifth anniversary of such previous determination.*
>
> *(d) No housing rehabilitation district shall be created, nor any proposed project declared an economically mixed project, by the governing body of any city, except a city having (i) no fewer than one hundred ten thousand nor more than one hundred eleven thousand inhabitants according to the 1970 federal census and (ii) at least seven per centum of all residential housing units located within such city receiving rental or mortgage interest subsidization from other than private sources.*

The parties agree that in view of the population and subsidy criteria in subparagraph (d) of § 36-55.30:2, the benefits of the 1979 amendment again have been limited to the City of Portsmouth.

Obviously, strict limitations have been placed upon the power granted to the Authority by the 1979 Amendment to finance housing for persons and families "other" than those of low and moderate income. The financing may be done only in an area designated a "housing rehabilitation district," § 36-55.30:2(a), or in a housing project qualifying as an "economically mixed project." § 36-55.30:2(b). And only the governing body of the city may create a housing rehabilitation district or declare a project to be an economically mixed project. Furthermore, the governing body may not make such designations unless a board, on which local private financial institutions are represented, determines that private enterprise and investment may not reasonably be expected to meet the public housing need. § 36-55.30:2(c). Also, in the case of a housing rehabilitation district, such status of the area terminates unless the board reaffirms its previous determination. *Id.*

On appeal, as in the trial court, defendants argue that the amended statutory language designating "persons and families of other than low

and moderate income" actually means upper income persons. Consequently, they contend that financing "only upper income housing is not a constitutionally permissible public purpose" for the Authority.

Reviewing the 1979 amendment, defendants point out that the General Assembly, in subsections (d) through (f) of its findings, states that a concentration of persons of low and moderate income even in standard structures does not eradicate undesirable social conditions; that the governing body of a city, in order to preserve the financial viability of the city and the health, welfare and prosperity of its citizens, has discretion to determine that its population be maintained as economically mixed by providing housing for upper income families in order to broaden the tax base of the area; and that, in order to provide housing for persons of low and moderate income, it may be necessary "or desirable" for a city to provide housing for upper income persons.

Defendants say that the General Assembly, having broadly expanded the purposes of the Act, then proceeded to clothe the Authority with the power to engage in upper income housing finance. They argue that of the four subsections of § 36-55.30:2, (a) and (b) are particularly important. According to defendants, the General Assembly has empowered the Authority, in an area designated under (a) by the city as a housing rehabilitation district, to finance an unlimited percentage of upper income housing. As to (b), defendants contend that if it becomes "desirable" for a series of reasons for the city to subsidize low and moderate income housing by placing upper income housing in the same project, the Authority is empowered to finance up to 80 percent of the housing units in that project for upper income families.

Assuming there are constitutional limits on the extent to which government can properly engage in housing finance, defendants say the question for decision is whether the primary purpose of the 1979 Amendment is to provide low and moderate income housing, with the upper income housing feature being merely incidental to the main purpose. Defendants contend that upper income housing is a substantial component of the 1979 Amendment and is the predominant part of the enactment, thereby making low and moderate income housing itself the incidental portion. Consequently, defendants maintain, there has been a constitutionally impermissible exercise of the power of the General Assembly by providing for upper income housing financing, and the bond issue is thus invalid.

The Authority, not explicitly challenging defendants' interpretation of the percentages of "other" persons to be financed under subsections (a) and (b) of § 36-55.30:2, argues that the General Assembly has

validly exercised its police power to provide safe and decent housing for low and moderate income persons at prices which those persons can afford. The Authority maintains that the program contemplated by the 1979 Amendment is a constitutional means of accomplishing that valid public purpose. We agree.

The central issue in this case stems from the statutory authorization for appropriation of state funds to the Capital Reserve Fund established for the bond issue. Under article X, § 8 of the Constitution, public funds must be used for a public purpose. Consequently, if the appropriation is for a public purpose and not a private purpose, the statutes in issue are not repugnant to the foregoing constitutional mandate. *Harrison* v. *Day,* 200 Va. 764, 775, 107 S.E.2d 594, 601 (1959).

Because of the presumption of validity which attaches to every enactment of the General Assembly, a reasonable doubt as to the constitutionality of any law must be resolved in favor of its legality. *Blue Cross* v. *Commonwealth,* 221 Va. 349, 358, 269 S.E.2d 827, 832 (1980). Moreover, a legislative declaration that a contemplated use is a public one, while not conclusive, is presumed to be correct. *City of Richmond* v. *Dervishian,* 190 Va. 398, 405, 57 S.E.2d 120, 123 (1950). But the test of the constitutional validity of an enactment is what may be done under it, what it allows. *Rudee Inlet Authority* v. *Bastian,* 206 Va. 906, 909-10, 147 S.E.2d 131, 134 (1966).

In *Mumpower* v. *Housing Authority,* 176 Va. 426, 11 S.E.2d 732 (1940), this court, quoting an earlier case, said that "a large discretion" is vested in the General Assembly to determine what the public interest requires and just what is necessary for the protection of such interest. 176 Va. at 443, 11 S.E.2d at 738. There, the court dealt with an exercise of the State's police power to eliminate slums and, in holding establishment of low income housing to be a constitutionally permissible exercise of that power, said, apropos this case:

> The evil sought to be remedied is a well known and recognized one, and, although the present method of attack may be novel, it is justified under established principles. These principles were designed to fit just such situations.

176 Va. at 444, 11 S.E.2d at 738. The *Mumpower* court further observed that the wisdom of the legislative judgment may not be vetoed by the judicial branch and, quoting another prior decision, said that courts " 'cannot run a race of opinions upon points of right, reason and expediency with the law making powers.' " *Id.*

Application of the foregoing principles to this case prohibits us from finding a lack of public purpose in the 1979 Amendment to the Act.

■ Here, the General Assembly has declared in plain terms in § 36-55.25, "as a matter of express legislative determination," that there is a serious shortage of sanitary and safe residential housing at prices which low and moderate income persons can afford. The legislature has further determined that such shortage will continue to foster substandard living conditions which is inimical to the health, welfare and prosperity of the citizens of this State. There is the further finding that private enterprise has been unable, without assistance, to produce new construction or achieve rehabilitation of low-cost housing, or to provide sufficient long-term mortgage financing for such projects. The lawmakers determined in 1979, obviously recognizing the deteriorating housing conditions in many cities and the "flight to the suburbs" of upper income city residents, that the fiscal vitality of such cities could not be preserved without maintaining a "mix" of persons of varied economic levels to broaden the tax base of such areas. The General Assembly further acertained that in order to provide proper housing for those of low and moderate income, it would be necessary to provide housing for persons of other economic levels, to encourage an infusion of such families into a housing project for the disadvantaged. The legislative judgment is that such a method of attack will stabilize blighted areas, will eliminate undesirable social conditions, will promote the prudent use of land, and will improve the welfare of the citizens of the Commonwealth generally.

■ Given the axiom that the general health, safety and morals of the residents of the Commonwealth are proper objects of the General Assembly's interest, it cannot be successfully disputed that eradicating slums and providing safe, sanitary, uncrowded housing, affordable by low and moderate income persons, will promote those objectives. In ratifying prior legislative judgments, this court in *Mumpower* has decided that providing housing for low income persons is a valid public purpose, and in *Fairfax County* v. *DeGroff*, 214 Va. 235, 237, 198 S.E.2d 600, 601 (1973), has said that providing housing for those of "moderate" income serves such a purpose.

■ We now hold that the dominant intention of the 1979 General Assembly was likewise to provide housing for low and moderate income persons and, incidental to that objective, properly authorized housing financing for persons of other than low and moderate income.

The findings of the legislature demonstrate a belief that promotion of economic and social integration in once-blighted areas and in low and moderate income housing will serve to alleviate the unsatisfactory social conditions which persist there and will curtail the drain on municipal finance stemming from such conditions.

In effect, defendants invite us to second-guess the lawmakers on matters of economics, sociology and public policy. This we may not do. Those considerations belong exclusively in the legislative domain. To invalidate this legislative action, we must find the General Assembly has acted arbitrarily, unreasonably and that its action has no substantial relation to the health, safety, morals or general welfare of the citizens of this Commonwealth. *West Brothers Brick Co.* v. *Alexandria,* 169 Va. 271, 288, 192 S.E. 881, 888 (1937). Under the law, we are prevented from reaching such a conclusion in this case.

Citing no case, within or without the state, that is direct authority for its position, defendants seek, by analogy, comfort in several Virginia cases.[1] In *Rudee Inlet Authority* v. *Bastian, supra,* the court

---

[1] In at least 22 states, statutes providing for financing of "low," "moderate," "mixed," or "higher" income public housing have withstood constitutional attack. *See Walker* v. *Alas. State Mortgage Ass'n.,* 416 P.2d 245 (Alas. 1966) (housing *per se* held constitutional as a public purpose); *Cal. Hous. Fin. Agency* v. *Elliott,* 17 Cal.3d 575, 551 P.2d 1193, 131 Cal. Rptr. 361 (1976) (mixed income); *In Re Interrogatories by Colo. State Senate,* 193 Colo. 298, 566 P.2d 350 (1977) (low and moderate income); *Rich* v. *State,* 237 Ga. 291, 227 S.E.2d 761 (1976) (low income); *John R. Grubb, Inc.* v. *Iowa Hous. Fin. Auth.,* 255 N.W.2d 89 (Iowa 1977) (low and moderate income); *Me. State Hous. Auth.* v. *Depositors Trust Co.,* 278 A.2d 699 (Me. 1971) (low income); *Mass. Hous. Fin. Agency* v. *New England Merchants Nat'l Bank of Boston,* 356 Mass. 202, 249 N.E.2d 599 (1969) (low and moderate income); *In Re Advisory Opinion On Constitutionality of Act No. 346 of Public Acts of 1966,* 380 Mich. 554, 158 N.W.2d 416 (1968) (low cost housing); *Minn. Hous. Fin. Agency* v. *Hatfield,* 297 Minn. 155, 210 N.W.2d 298 (1973) (low and moderate income); *Huber* v. *Groff,* 171 Mont. 442, 558 P.2d 1124 (1976) (lower income); *N.J. Mortgage Fin. Agency* v. *McCrane,* 56 N.J. 414, 267 A.2d 24 (1970) (financing without regard to income); *Martin* v. *N.C. Hous. Corp.,* 277 N.C. 29, 175 S.E.2d 665 (1970) (low income); *Boardman* v. *Okla. City Hous. Auth.,* 445 P.2d 412 (Okla. 1968) (low income); *In Re Constitutionality of ORS 456.720,* 272 Or. 398, 537 P.2d 542 (1975) (low income); *Johnson* v. *Pa. Hous. Fin. Agency,* 453 Pa. 329, 309 A.2d 528 (1973) (low and moderate income); *Opinion to Governor,* 112 R.I. 151, 308 A.2d 809 (1973) (low and moderate income); *Casey* v. *S.C. State Hous. Auth.,* 264 S.C. 303, 215 S.E.2d 184 (1975) (low and moderate income); *West* v. *Tenn. Hous. Dev.,* 512 S.W.2d 275 (Tenn. 1974) (low and moderate income); *Utah Hous. Fin. Agency* v. *Smart,* 561 P.2d 1052 (Utah 1977) (low and moderate income); *Vt. Home Mortgage Credit Agency* v. *Montpelier Nat'l Bank,* 128 Vt. 272, 262 A.2d 445 (1970) (low income incidentally benefitting moderate income people);

decided that harbor facilities established for the use of the public served a public purpose and that private property could be taken for such purpose by condemnation. The court also held, however, that the grant of unrestricted power to sell or lease the condemned land was unconstitutional because the statute, in effect, permitted a taking of private property for private use. Defendants, drawing on the dissent in *Bastian,* argue that the principle which must be "extracted" from *Bastian,* as well as *Mumpower* and *DeGroff,* is that housing authorities "may not engage in activities which primarily benefit a select few, namely upper income persons, because such activities do not constitute a public purpose."

Defendants' reliance on *Bastian* is misplaced. In that case, the court pointed out there was no restriction in the statutes in issue "to the effect that the sale or leasing of the land condemned by the Authority for public use shall only be in furtherance of or incidental to the main purposes of the act or no longer needed for the public use." 206 Va. 912, 147 S.E.2d at 136. No such deficiency exists here. As we have already demonstrated, the power to finance housing for "other" persons contains strict limitations, all tied to the primary purpose of providing low and moderate income housing, and only in the event private enterprise cannot meet the basic need.

■ Defendants also rely on *Hunter* v. *Redevelopment Authority,* 195 Va. 326, 78 S.E.2d 893 (1953). There, a redevelopment authority sought to eradicate two of Norfolk's worst slum and blighted areas, covering about 127 acres. Of the total area, 33 percent was to be developed for municipal purposes, 25 percent to be devoted to low-rent public housing and the remaining 42 percent, undesirable for residential purposes and not needed for municipal use, was to be redeveloped by private enterprise for commercial use consistent with the project. Against the condemnees' argument that the conveyance of the 42 percent for redevelopment by private enterprise was for a private purpose, this Court held that the primary purpose was the public purpose of eliminating slums and the conveyance of the 42 percent for redevelopment was incidental to that purpose. Here, defendants argue that Hunter "establishes parameters of private benefit which apply to the present case." Under *Hunter,* defendants say, "a 42% private benefit is incidental, while a 100% private benefit is impermissible."

*State Ex Rel W. Va. Hous. Dev. Fund* v. *Waterhouse,* 212 S.E.2d 724 (W. Va. 1974) (higher income groups); *State Ex Rel Warren* v. *Nusbaum,* 59 Wis.2d 391, 208 N.W.2d 780 (1973) (low or moderate income).

Defendants' reliance on exact percentages in their effort to establish that the Act mainly permits public funds to be used for private purposes is misdirected. Recently in *Rudder* v. *Redevelopment and Housing Authority,* 219 Va. 592, 249 S.E.2d 177 (1978), citing *Mumpower* and *Hunter,* we held that "most" or "probably 75 percent" of land condemned for the purpose of blight elimination could be resold to private interests without affecting the public purpose. 219 Va. at 597, 249 S.E.2d at 179. We said:

> [T]he primary public purpose contemplated by the Authority was the elimination of a blighted or deteriorated area. The disposition of the land, although designed to prevent a recurrence of the blighted conditions, is incidental and subordinate to this primary purpose.

*Id.* Likewise, in the present situation the General Assembly has decided that some form of governmental intervention is necessary to encourage elimination of urban blight while providing housing for low and moderate income persons. The power to make loans in connection with this effort is, as the Authority points out, "far less of a governmental intrusion than eminent domain," and is a valid exercise of the police power to remedy those conditions.

Defendants advance numerous other constitutional challenges to the Act, only two of which merit discussion.

In order to assure that the Capital Reserve Fund fulfills the minimum capital reserve requirements established for the bond issue, provisions are made for state appropriations in the event of a deficit in the Fund. Code § 36-55.41(2) creates a mandatory procedure designed to bring to the General Assembly's attention any deficit in the Fund. According to the procedure, if the Fund is reduced below the minimum capital reserve requirement in any year, the chairman of the Authority must notify the Governor and the Director of the Budget of the extent of the deficiency. Section 36-55.41(2) further provides:

> Within five days after the beginning of each session of the General Assembly, the Governor shall submit to the presiding officer of each house printed copies of a budget including the sum, if any, required to restore each such capital reserve fund to the minimum capital reserve fund requirement for such fund.

The General Assembly then may appropriate sums sufficient to restore the Fund to the minimum capital reserve requirement.

Defendants contend that the foregoing provision "purports to be a mandatory obligation, imposed on the Governor by the General Assembly." They argue such a directive violates article III, § 1 of the Constitution, dealing with separation of powers[2] and article V, § 5, concerning legislative responsibilities of the Governor.[3] Defendants maintain that discretion respecting legislative proposals is reserved to the Governor by the Constitution and by statute,[4] but under the Act he must forfeit discretion over the budget's contents, thus making § 36-55.41(2) constitutionally invalid. We do not agree.

As the Authority points out, the crux of this issue is whether the statutory provision in question requires the Governor to include a Capital Reserve Fund deficiency in his budget as an *agency request* only, or whether the provision requires the Governor *to recommend* such an appropriation to the legislature. We hold the statute merely requires the former and represents a proper discharge of the legislative function to establish the form of a budget with specified contents.[5]

Code § 2.1-398 requires the Governor's budget to include in "separate parallel columns," *inter alia,* each "agency's request" and "the Governor's recommendation for each year of the ensuing biennial period." Nowhere in the attacked statutory provision is there a directive the Governor must recommend appropriation of the amount of the Capital Reserve Fund shortfall. We construe the provision merely to require the Governor to include any such amount, for informational purposes only, as an agency request. Manifestly, this budgetary technique for keeping the General Assembly apprised of any deficit that may develop in one of the Authority's Capital Reserve Funds is part of the "'common link'" which exists between the executive and legislative departments of government and which recognizes the respective roles of each. *Winchester & Strasburg R.R.* v. *Commonwealth,* 106 Va. 264, 270, 55 S.E. 692, 694 (1906), quoting *Dreyer* v. *Illinois,* 187 U.S. 71, 84 (1902).[6]

---

[2] "The legislative, executive, and judicial departments shall be separate and distinct, so that none exercise the powers properly belonging to the others, . . ."

[3] "The Governor shall communicate to the General Assembly, at every regular session, the condition of the Commonwealth, recommend to its consideration such measures as he may deem expedient, . . ."

[4] Code § 2.1-398 provides, in part, that the budget submitted by the Governor shall be "based on his own conclusions and judgment."

[5] The trial court ruled the statutory provision was unconstitutional but decided the provision had no bearing on the validity of the bond issue.

[6] For another example of the "common link," see Code § 51-111.47(k) which deals with appropriations to the Virginia Supplemental Retirement System as follows:

The appropriation bill which is submitted to the General Assembly by the

In conclusion, defendants argue that subsection (d) of § 36-55.30:2, restricting housing rehabilitation districts and economically mixed projects to the City of Portsmouth, amounts to unconstitutional special legislation. They contend that the expenditure of state funds appropriated for a statewide public purpose may not be expressly limited to remedy problems existing in only one city. We disagree.

Article VII, § 1 of the Constitution defines a "special act" as a "law applicable to a county, city, town, or regional government and for enactment shall require an affirmative vote of two-thirds of the members elected to each house of the General Assembly." In addition, article VII, §2 allows the General Assembly to provide by special act for the powers of any city. Assuming subsection (d) is a special act, the evidence shows the 1979 Amendment was approved by the House of Delegates and the Senate by more than the required two-thirds vote. Consequently, defendants' special legislation argument is without merit.

For the foregoing reasons, the order validating[7] the bonds will be

*Affirmed.*[8]

---

Governor prior to each regular session that begins in an even-numbered year *shall include* the contributions which will become due and payable to the retirement allowance account from the State treasury during the biennium next following, based on the contribution rates certified by the Board. . . . [Emphasis added.]

[7] In this litigation, the validity of the bonds has been established prior to their issuance in accordance with Code § 15.1-214 which permits a proceeding to be brought "*at any time*...to establish the validity of such bonds, [and] the legality of all proceedings *theretofore* taken in connection with the *authorization or issuance* of such bonds, . . ." (Emphasis added.) The final order to be entered here does not, of course, adjudicate any collateral questions which could conceivably be raised in the future related to the subsequent *application* of bond proceeds. *See* Code § 15.1-220.

[8] In dissent, Mr. Justice Poff argues this decision is not "binding and conclusive" within the meaning of Code § 15.1-220.

During the course of this majority opinion, we have said the trial court reached the right result for not all of the correct reasons. *See* text accompanying note 5 *supra*. Thus, we affirmed the judgment below.

In effect, that dissent advances the view that a final decision and judgment of a majority of this Court actually is not a final judgment at all. The error in such a contention is disclosed by a mere statement of it. See Va. Const. art VI, § 2 and Code §§ 17-93 and -94 providing for a quorum and for final judgment on appeal upon concurrence of at least three justices, except when a law is declared unconstitutional.

The vote in this case is four to two on the main issues of appeal. On the procedural question addressed in Mr. Justice Carrico's dissent, the vote is at least three

CARRICO, J., dissenting.

While I agree with the views expressed by Mr. Justice Poff in his separate opinion, I would add another basis for disagreement with the majority.

As pointed out in the majority opinion, the legislation under review imposes "strict limitations" upon the power of the Virginia Housing Development Authority to finance projects that provide housing for persons in upper income brackets. The Authority may finance upper income housing only in housing rehabilitation districts or economically mixed projects. More important to the problem I address, only a local governing body may create a housing rehabilitation district or declare an economically mixed project and then only after receipt of a favorable report of a board composed principally of local bankers. Finally, by its terms, the legislation under review relates to the creation of housing rehabilitation districts or the declaration of economically mixed projects solely in the City of Portsmouth. The proceeds of the bonds proposed to be issued, therefore, can be used to finance housing projects only in that city.

After this case was argued, we discovered that the record did not contain any resolution of the council of the City of Portsmouth creating a housing rehabilitation district or declaring an economically mixed project in the city. Accordingly, we called upon counsel to comment in writing upon the absence of the local resolution, and we later ordered oral argument on the point.

Conceding that no local resolution had been adopted, counsel for both sides took the position that the adoption of such a resolution was not a prerequisite to the issuance of the bonds in question. The legislation under review, counsel stated, does not require the creation of a housing rehabilitation district or the declaration of an economically mixed project prior to the issuance of bonds, and the bond resolution adopted by the Authority does not limit the use of the proceeds of the sale of bonds to any particular project or projects. As counsel perceived the situation, if the bonds are held valid by this court but not sold because of the lack of a qualifying project, the bonds would never be issued; or, if the bonds were issued and sold but the proceeds not expended because no project then qualified,

---

to three; this results in an affirmance on that issue by an equally divided court. *Funkhouser* v. *Spahr,* 102 Va. 306, 313, 46 S.E. 378, 380 (1904). Hence, the judgment is binding and conclusive as to the validity of the bonds on all issues within the meaning of Code § 15.1-220.

the proceeds would be used to redeem the bonds or held until a qualified project presented itself.

In counsel's view, the absence of a resolution creating a housing rehabilitation district or declaring an economically mixed project presents an "application of proceeds" issue, to be decided later, rather than an "authorization or issuance of the bonds" question, which must be resolved now. Consequently, counsel maintained, the nonexistence of the local enabling resolution is a matter "beyond the scope of inquiry in this case."

Apparently, this view has been adopted by the majority. In note 7 of its opinion, the majority disclaims any intention to adjudicate "collateral questions which could conceivably be raised in the future related to the subsequent *application* of bond proceeds."

I disagree both with the majority and with counsel. This proceeding was brought pursuant to Code §§ 15.1-213 to -221, whose provisions "apply to all suits, actions and proceedings of whatever nature involving the validity of bonds of any political subdivision." Code § 15.1-213. Under § 15.1-214, the court is required to determine, *inter alia,* "the legality of all proceedings theretofore taken in connection with the authorization or issuance of such bonds." I comprehend that the mandate to determine the validity of bonds from the standpoint of "proceedings theretofore taken" necessarily includes investigation into all preissuance steps, whether taken or omitted, which might affect the validity of the bonds. One preissuance requirement is that the local governing body by resolution shall create a housing rehabilitation district or declare an economically mixed project.

It is indisputable that the legislation under review applies only to the City of Portsmouth and that the proceeds of the bonds proposed to be issued pursuant thereto can be used only to finance construction in a housing rehabilitation district or an economically mixed project created or declared by the council of that city. I believe, therefore, that the adoption of an enabling resolution by the City Council of Portsmouth is a condition precedent to the Authority's issuance of the bonds in question and, hence, to the establishment of the validity of the bonds themselves.

Consequently, I reject the notion that the lack of a local enabling resolution is beyond the scope of inquiry in this case and that the point should be left for later determination. Indeed, a party intending to rely upon the absence of the necessary local resolution would omit at his peril to raise the point in a bond validation proceeding.

Under Code § 15.1-220, a final decree validating bonds is "forever binding and conclusive" not only as to all matters actually adjudicated but also as to any point "which might have been presented." Such a decree also constitutes a permanent injunction against the institution of any action or proceeding contesting any matter adjudicated or "which might have been called in question in [the bond validation] proceedings."

The absence of a local enabling resolution is fatal to the validity of the bonds proposed to be issued in this case. Thus, I would reverse the decree of the trial court and enter a final decree declaring the proposed issue invalid.

POFF, J., dissenting.

I concur in the views expressed in Mr. Justice Carrico's opinion and, adding a footnote, I dissent from the views of the majority.

The majority decision appears to rest primarily upon the conclusion that "matters of economics, sociology and public policy . . . belong exclusively in the legislative domain" and that this Court may not "second-guess the law-makers". We have held that, although presumed to be right, "a declaration by the General Assembly . . . that a contemplated use is a public one, is not conclusive and is subject to judicial review". *Inlet Authority* v. *Bastian,* 206 Va. 906, 909, 147 S.E.2d 131, 134 (1966). The legislative power to declare public policy is subject, of course, to the constraints of the Constitution. Whether the goal of a legislative act is a public purpose and whether the act is reasonably designed to achieve that purpose are constitutional questions. As a matter of final determination, constitutional questions belong exclusively in the judicial domain.

We have resolved these questions in favor of housing assistance programs for lower-income families. *Mumpower* v. *Housing Authority,* 176 Va. 426, 11 S.E.2d 732 (1940); *Fairfax County* v. *DeGroff,* 214 Va. 235, 198 S.E.2d 600 (1973). But the program inaugurated by the 1979 amendments to the Virginia Housing Development Authority Act cannot fairly be characterized as a lower-income housing program. Rather, it is a program which empowers the Authority to expend public funds to grant a few affluent families in one Virginia city a housing subsidy at the expense of taxpayers in every tax bracket in every quarter of the State. Under Article X, § 8, of our Constitution, public funds must be used for public purposes; they cannot be spent to provide private benefits for a select few.

It is true that a private benefit will not invalidate a public purpose when the former is merely incidental to the latter. *Hunter* v. *Redevelopment Authority*, 195 Va. 326, 78 S.E.2d 893 (1953). But is the private benefit conferred by this statute merely incidental to the public purpose underlying the lower-income housing program? In an "economically mixed project", 80% of the benefit may be private; in a "housing rehabilitation district", the private benefit may be total. If this upper-income housing program is merely incidental to the lower-income housing program, then this is a case of the tail wagging the dog. In the shadow of the majority opinion, nothing with the slightest nexus to a program which serves a constitutionally permissible public purpose will be constitutionally impermissible.

For yet another reason, subordinate but sufficient unto itself, the order validating the bonds should be reversed. The statute provides that "the Governor shall submit . . . a budget including the sum . . . required to" finance any deficit which may occur in the fund established to pay the principal and interest on the bonds. In his letter opinion, the trial judge expressed the view that this provision "is unconstitutional and invalid" under Article III, § 1, and Article V, § 5, of the Virginia Constitution which, he said, "vests in the Governor the sole discretion to determine what legislative recommendations he makes to the General Assembly in the budget." * He ruled, however, that this provision is severable and that "elimination of this provision does not defeat the purpose of the Act." Incorporating his letter opinion in the final order, he declared that "the means provided for the payment of the Bonds are valid" and that "the Bonds are valid".

But the provision severed by the trial judge is, itself, part and parcel of one of the crucial "means provided for payment". Indeed, the statute provides no other means of financing a deficit. Absent such means, the statute fails to guarantee full payment. Hence, the trial judge erred in validating the statute as severed. Ignoring that error, the majority affirm the validation order but, implicitly, reverse the very ruling upon which it was based. In effect, the majority has affirmed in part, reversed in part, and modified the order entered below. Since the majority does not affirm in full, the validation order

---

\* This view finds support in the decisions of courts in other states applying comparable constitutional provisions to similar statutes. *State* v. *Waterhouse*, 212 S.E.2d 724, 732 (W. Va. 1974); *Warren* v. *Nusbaum*, 59 Wis.2d 391, 450, 208 N.W.2d 780, 813 (1973).

is not "binding and conclusive" within the meaning of Code § 15.1-220.

CARRICO, J., joins in dissent.

THOMPSON, J., dissenting in part and concurring in part.

I concur in that part of the dissent of Mr. Justice Carrico which states:

"I believe, therefore, that the adoption of an enabling resolution by the City Council of Portsmouth is a condition precedent to the Authority's issuance of the bonds in question and, hence, to the establishment of the validity of the bonds themselves."

As to the remainder of the case, I concur in the majority opinion.