COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, Haley and Alston
Argued at Alexandria, Virginia


MARBLEX DESIGN INTERNATIONAL, INC. AND
  ERIE INSURANCE PROPERTY CASUALTY COMPANY
                                                                  OPINION BY
v.        Record No. 1545-08-4                        JUDGE JAMES W. HALEY, JR.
                                                                  JUNE 30, 2009
JILL ANN STEVENS AND
  SEBAHAT CEVIKEL


              FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

              Dawn Boyce (Trichilo, Bancroft, McGavin, Horvath & Judkins,
              P.C., on brief), for appellants.

              Forest A. Nester (Brooke-Devlin & Nester, on brief) for appellee Jill
              Ann Stevens.

              No brief or argument for appellee Sebahat Cevikel.


        The Workers' Compensation Commission ("commission") awarded Jill Stevens

dependent benefits as the widow of Mustal Mursaloglu.  Marblex Design International, Inc. and

its insurer, Erie Insurance Property Casualty Company (collectively "Marblex") maintain the

commission erred because the marriage between Mursaloglu and Stevens was:  1) illegal;

2) void; and 3) "against public policy," in that it was a "sham green-card marriage."[1]  We affirm

the commission.

_____

        [1] Marriages to an alien "for the sole purpose of allowing [the alien] to obtain naturalized
citizen status in the United States . . . are frequently referred to as 'green card marriages' because
of the color of the document the alien receives from the Immigration and Naturalization Service
(INS) as evidence of legitimate status."  Kleinfeld v. Veruki, 7 Va. App. 183, 186, 372 S.E.2d
407, 408 (1988).

FACTS

Mursaloglu, an employee of Marblex, was injured in an industrial accident on January 18, 2006 and died as a result of those injuries on May 23, 2006.

The Clerk of the Circuit Court of the City of Virginia Beach issued a marriage license to Mursaloglu and Stevens on June 9, 2003. A marriage commissioner married the parties on June 14, 2003, and the certificate documenting that marriage was put to record in the clerk's office on June 17, 2003.

We find no need to set forth further facts, though noting that the evidence adduced could support either a conclusion that the marriage was, or was not, a "sham green-card marriage."

## ANALYSIS

### Was the Marriage Illegal?

Our analysis permits us to assume, without deciding, that the union documented above could be found a "sham/green card marriage."

18 U.S.C. § 371 makes it a crime to "conspire either to commit any offense against the United States, or to defraud the United States . . . ." Titled "Marriage Fraud," 8 U.S.C. § 1325(C) reads: "Any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both." It is these provisions that Marblex maintains made the marriage "illegal."

However, the crime is not the marriage itself, but conspiracy to violate immigration laws. In addressing former 18 U.S.C. § 88 (revised 1948), now recodified as 18 U.S.C. § 371 and former 8 U.S.C. § 180 (the War Bride Act), likewise prohibiting sham marriages to evade immigration law, the United States Supreme Court wrote in Lutwak v. United States, 344 U.S. 604, 611 (1953):

We do not believe that the validity of the marriages is material. No one is being prosecuted for an offense against the marital relation. We consider the marriage ceremonies only as a part of the conspiracy to defraud the United States . . . . [T]he ceremonies were only a step in the fraudulent scheme and actions taken by the parties to the conspiracy.

This language is of import because the federal circuit court, from which the case arose, had in part based its decision on the validity of the marriages themselves. See United States v. Lutwak, 195 F.2d 748 (7th Cir. 1952). As one commentator has noted: "[t]he Court refused to decide the issue of the validity of the marriages, on which the circuit court's opinion rested . . . the Supreme Court declared the validity of the marriages to be immaterial to whether the convictions for conspiracy to defraud based on the sham marriages could be sustained." Maria Isable Medina, The Criminalization of Immigration Law: Employer Sanctions and Marriage Fraud, 5 Geo. Mason L. Rev. 699, 707 (1997).

In granting the award the deputy commissioner wrote: " No evidence before the Commission establishes that Jill Stevens has been charged with, much less convicted of, a crime pursuant to the referenced federal statutes." In affirming the full commission wrote: "Neither Stevens nor the decedent were charged under either statute."

The federal statutes do not address the question of the validity of a marriage; they only address the intent with which the parties entered the marriage, as a portion of a conspiracy. In short, no federal statute says the marriage, itself, is "illegal." It is undisputed, as noted above, that the parties obtained a marriage license, that a marriage commissioner performed the ceremony, and that the marriage was recorded in the Clerk's Office of the Circuit Court of Virginia Beach. In short the marriage was a legal marriage.

<u>Was the Marriage Void or Voidable?</u>

Marblex makes a similar argument that the federal statutes make the marriage void. Under the statutory interpretation principle of *expressio unius est exclusio alterius*, the "'mention

of a specific item in a statute implies that omitted items were not intended to be included within the scope of the statute.'" GEICO v. Hall, 260 Va. 349, 355, 533 S.E.2d 615, 617 (2000) (quoting Turner v. Wexler, 244 Va. 124, 127, 418 S.E.2d 886, 887 (1992)). That principle is firmly established in our jurisprudence. See Belton v. Crudup, 273 Va. 368, 373, 641 S.E.2d 74, 77 (2007); Commonwealth v. Brown, 259 Va. 697, 704-05, 529 S.E.2d 96, 100 (2000); NRV v. Virginia Dept. of Health, 51 Va. App. 514, 525, 659 S.E.2d 527, 533 (2008). Code § 20-45.1 and § 20-45.2 set forth what marriages are void in Virginia. A "sham/green card" marriage is not included.

A second principle of statutory construction is here applicable. "Interpretation of the statute by comparison to other, similar statutes supports this result . . . showing the General Assembly clearly knew how to limit a privilege . . . when it so desired." Schwartz v. Schwartz, 46 Va. App. 145, 157-58, 616 S.E.2d 59, 66 (2005). See also Martin v. Howard, 273 Va. 722, 726, 643 S.E.2d 229, 231-32 (2007); Hechler Chevrolet v. General Motors Corp, 230 Va. 396, 401, 337 S.E.2d 744, 747 (1985). Succinctly stated: "The Legislature is presumed to know what it intends to do and can do." Miller v. Commonwealth, 172 Va. 639, 649, 2 S.E.2d 343, 348 (1939).

In Granados v. Windson Development Corp., 257 Va. 103, 509 S.E.2d 290 (1999), the employee had given his employer false identification documents. It was established he was an illegal alien. The Virginia Supreme Court denied Granados benefits because he was not an "employee" as defined in Code § 65.2-101 of the Virginia Workers' Compensation Act, that is, he "was not in the service of Windson under any contract of hire because, under the Immigration Reform and Control Act of 1986, an illegal alien cannot be employed lawfully in the United States." Id. at 108, 509 S.E.2d at 293. Following that decision, the legislature amended Code

§ 65.2-101, effective April 19, 2000,[2] by re-defining an employee to include "aliens and minors . . . whether lawfully or unlawfully employed . . . ."

In Waterman v. Halverson, 261 Va. 203, 207, 540 S.E.2d 867, 869 (2001), the Supreme Court of Virginia wrote that: "The General Assembly is presumed to be aware of the decisions of this Court when enacting legislation. Dodson v. Potomac Mack Sales & Serv., Inc., 241 Va. 89, 94, 400 S.E.2d 178, 180 (1991)." And "[a]s a general rule, there is a presumption that a substantive change in law was intended by an amendment to an existing statute. Richmond v. Sutherland, 114 Va. 688, 693, 77 S.E. 470, 472 (1913)." Dale v. City of Newport News, 243 Va. 48, 51, 412 S.E.2d 701, 702 (1992).

Hence, it is clear the legislature was aware of the decision in Granados and specifically chose to change the law with respect to the availability of workers' compensation benefits to illegal aliens. By analogy, if the legislature had desired to deny workers' compensation dependant benefits to the purported spouse in "sham/green card" marriages, they could have done so by adding the same to the list of void marriages prohibited by Code § 20-45.1. They have not.

Moreover, there is a distinction between a void marriage and a voidable marriage.

In McConkey v. McConkey, 216 Va. 106, 215 S.E.2d 640 (1975), Clara McConkey had been divorced from Edward McConkey and awarded alimony. She thereafter married one Sykes on October 16, 1971, which terminated her alimony by statute. On November 5, 1971, she filed a bill of complaint against Sykes seeking annulment because of his fraud.[3] She prevailed, and

---

[2] Thus, the amendment was "emergency" legislation. See Va. Const., art. IV, § 13.

[3] Code § 20-89.1(a) permits the annulment of a marriage entered into "by virtue of fraud." Presumably, either Mursaloglu or Stevens could have filed an action seeking annulment of their marriage on this statutory basis. But these individuals would have been husband and wife until a decree of annulment was entered.

- 5 -

the final order recited that her marriage to Sykes was "null, void and of no effect." She then sought reinstatement of the alimony award from McConkey. In denying that request, the Supreme Court wrote: "[Wife's] marriage to Sykes was not void *ab initio*. There is no evidence that the marriage ceremony was invalid. The annulment was based upon fraud on the part of Sykes, so that the marriage was voidable if [wife] desired to have it annulled." Id. at 107, 215 S.E.2d at 641 (citation omitted).

In Tolar v. Oakwood Smokeless Coal Corp., 173 Va. 425, 435, 4 S.E.2d 364, 368 (1939), Martha Tolar had honestly, but mistakenly, believed her husband had been killed in West Virginia, and she subsequently married Raymond Tolar in Virginia. Raymond was killed in an industrial accident, and Martha sought workers' compensation benefits as a wife/dependant. The Court denied those benefits because, under Virginia law, a bigamous marriage is void *ab initio*. The Court quoted from Keezer on Marriage and Divorce, page 16:

> "A void marriage confers no legal rights, and, when it is determined that the marriage is void, it is as if no marriage had ever been performed. . . . A voidable marriage differs from a void marriage in that it may be afterwards ratified by the parties . . . and usually is treated as a valid marriage until it is decreed void."[4]

Id. at 432, 4 S.E.2d at 367.

In Alexander v. Kuykendall, 192 Va. 8, 13, 63 S.E.2d 746, 748-49 (1951), the Court noted that: "A void marriage is a mere nullity and its validity may be impeached in any court,

---

[4] The Court noted that, under West Virginia law, bigamous marriages were voidable and only become void when so declared "by a decree of nullity." No such decree of nullity had been entered by a West Virginia court. Martha's first marriage had been in West Virginia, but the Court declined to accept that state's view because "The statutes and public policy of Virginia as reflected by legislative pronouncement and judicial construction, are emphatically opposed to the recognition of the validity of a bigamous union." Tolar, 173 Va. at 434, 4 S.E.2d at 368. In Chitwood v. Prudential, 206 Va. 314, 317, 143 S.E.2d 915, 918 (1965), insurance proceeds were denied because "[T]he marriage of plaintiff to Chitwood in South Carolina was void in that state . . . and it was also void in Virginia, where the parties cohabitated."

- 6 -

whether the question arises directly or indirectly, and whether the parties be living or dead. This is not true of a voidable marriage."

This Court addressed the distinction in Kleinfield v. Veruki, 7 Va. App. 183, 372 S.E.2d 407 (1988). Kleinfield had married one Garcia in New Jersey in what she admitted was a "sham green card marriage" and, thereafter, married Veruki in New York. She argued that her marriage to Garcia was "*void ab initio*," not merely voidable, and, accordingly, her marriage to Veruki was not bigamous and, accordingly, did not deny her alimony. We concluded that because New Jersey law:

> [a]uthorizes nullity judgments in circumstances where the parties lacked genuine consent *and have not subsequently ratified the marriage*, we believe that in New Jersey green card marriages must be merely voidable and not void *ab initio*. For, if the parties can subsequently ratify the marriage and give it legal effect, the marriage could not have been void from its commencement.

Id. at 188, 372 S.E.2d at 410.

Because the New Jersey marriage had not been nullified, the New York marriage was bigamous. See also Shoustari v. Zamani, 39 Va. App. 517, 574 S.E.2d 314 (2002).

As noted in 5 Arthur Larson & Lex K. Larson, Larson's Worker's Compensation Law § 96.02(2), page 96-6 (2004 ed.), "The basic rule is that the regular domestic relations law of the state controls in compensation proceedings. Ordinarily, this means, in the case of validity of marriage, the law of the state where the marriage was conducted . . . ."

Relying on principles of statutory interpretation and the above decisions of Virginia appellate courts, we conclude the marriage here considered was voidable, not void *ab initio*. Since that marriage was never voided, it is valid.[5]

---

[5] Our decision comports with that of the Court of Appeals of Utah. "Because the Utah Legislature did not include immigration-motivated marriages among those deemed void, we hold such marriages are merely voidable under Utah law—i.e., valid until nullified." Kunz v. Kunz and Spencer, 136 P.3d 1278, 1287 (Utah Ct. App. 2006).

<u>Does the Marriage Violate Virginia Public Policy?</u>

Marblex further argues that violation of the Federal statutes violates Virginia public policy. "Public policy can no more be accurately defined than can due process of law. As Sir James Burroughs wisely observed it is 'a very unruly horse.'" <u>Old Dom. Trans. Co. v. Hamilton</u>, 146 Va. 594, 608, 131 S.E. 850, 855 (1926). As the then Virginia Supreme Court of Appeals observed: "The very reverse of that which is public policy at one time may become public policy at another time. Hence, no fixed rule can be given by which to determine what is public policy." <u>Wallihan v. Hughes</u>, 196 Va. 117, 124-25, 82 S.E.2d 553, 558 (1954) (citing 12 Am. Jur. <u>Contracts</u> § 169, p. 666).

It is for good reason, then, that with few exceptions, the public policy of Virginia is "expressed by the General Assembly," <u>Williamsburg Peking Corp. v. King</u>, 270 Va. 350, 354, 619 S.E.2d 100, 102 (2005), <u>see</u> <u>e.g.</u> <u>Smith v. Givens</u>, 223 Va. 455, 458, 290 S.E.2d 844, 846 (1982) ("When as a public policy determination, the General Assembly decides to prescribe special evidentiary standards for proof of paternity, it knows how to do so." (quoting <u>Allstate Messenger Serv. v. James</u>, 220 Va. 910, 912, 266 S.E.2d 86, 87 (1980))), or by the people, <u>see</u> <u>e.g.</u> <u>United States v. Blackman</u>, 270 Va. 68, 79, 613 S.E.2d 442, 447 (2005) ("this public policy goal was expressly embodied in Article XI of the Constitution of Virginia . . ."), rather than by appellate courts. Such courts will decline to resolve a specific issue as "[a] matter properly left to the General Assembly to consider as an issue of public policy." <u>Nobrega v. Commonwealth</u>, 271 Va. 508, 516, 628 S.E.2d 922, 926 (2006).

"The public policy of Virginia . . . has been to uphold the validity of the marriage status as for the best interest of society, except where marriage is prohibited between certain persons." <u>Needam v. Needam</u>, 183 Va. 681, 686, 32 S.E.2d 288, 290 (1945). "[I]t is the responsibility of the legislature, not the judiciary, to formulate public policy, to strike the appropriate balance

between competing interests, and to devise standards for implementation." <u>Wood v. Board of Supervisors of Halifax Cty.</u>, 236 Va. 104, 115, 372 S.E.2d 611, 618 (1988). If the General Assembly wishes to include "sham/green card" marriages among those declared void, and against public policy, as set forth in Code §§ 20-45.1 and 20-45.2, they know how to do so.

As we noted in <u>Chauncey Hutter, Inc. v. VEC</u>, 50 Va. App. 590, 600, 652 S.E.2d 151, 156 (2007):

> We do not address [public policy] arguments because "[t]he calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." <u>Pers. Adm'r of Massachusetts v. Feeney</u>, 442 U.S. 256, 272 (1979). A court may not "second-guess the lawmakers on matters of economics, sociology and public policy . . . . Those considerations belong exclusively in the legislative domain." <u>Infants v. Virginia Hous. Dev. Auth</u>, 221 Va. 659, 671, 272 S.E.2d 649, 656 (1980).

Accordingly, we decline to hold a putative sham green card marriage is in violation of the public policy of Virginia.

CONCLUSION

In summary, Marblex argues that reversal of the commission's decision is a necessary legal consequence of the federal statutes forbidding "sham/green card" marriages. But Stevens has not been indicted or convicted of violating these statutes and, even if she had been, the statutes forbid entering into a marriage with the intention to evade the immigration laws; they do not purport to affect the validity of the marriage itself. Marblex's related arguments that a sham/green card marriage is 1) void; and 2) contrary to public policy find no support in the enactments of the legislature, even though the Code already describes, with specificity, the categories of marriage that are void because they violate Virginia public policy. Accordingly, we conclude that the commission did not err in its award of survivor benefits.

<u>Affirmed.</u>