(306 P.3d 306)
No. 108,087

DANIEL J. ZIMMERMAN and SARA K. ZIMMERMAN, *Appellants,* v. RICHARD W. BROWN and BROWN, ISERN & CARPENTER, *Appellees.*

144

Opinion filed July 12, 2013.

*Michael J. Wyatt*, of Mann Law Offices, L.L.C., of Hutchinson, for appellants.

*Gerald L. Green*, of Gilliland & Hayes, P.A., of Hutchinson, for appellees.

Before MALONE, C.J., GREEN and STANDRIDGE, JJ.

STANDRIDGE, J.: Daniel and Sara Zimmerman (the plaintiffs) brought a legal malpractice claim against attorney Richard Brown and Richard's law firm, Brown, Isern & Carpenter (the defendants), related to the sale of the plaintiffs' Quixtar (formerly Amway) business to Richard and his wife. Marlene Brown, Richard's wife, was also originally named as a defendant but was later dismissed from the action. The defendants moved for summary judgment on grounds that the doctrines of in pari delicto and illegality prohibit the plaintiffs from recovering damages against the defendants for legal malpractice. Alternatively, the defendants argued the plaintiffs failed to come forward with sufficient evidence to establish the essential elements of a legal malpractice cause of action. The district court granted summary judgment in favor of the defendants based on the defenses of in pari delicto and illegality. In light of this ruling, the court found it unnecessary to address whether the plaintiffs had come forward with sufficient evidence to establish legal malpractice.

But the record on summary judgment reveals several disputes of material fact that must be resolved by a jury before the court can determine whether the in pari delicto defense applies to prohibit the plaintiffs from recovering damages; thus, the district court erred in holding at the summary judgment stage of the proceedings, as a matter of law, that the doctrine prohibits the plaintiffs from recovering damages against the defendants for legal malpractice. Summary judgment in favor of the defendants based on illegality also was improper because there is insufficient evidence in the record to establish as a matter of law that the damages sustained by Richard's alleged breach of fiduciary duty was a natural and probable consequence of the plaintiffs' decision to sell their Quix-

tar business to Richard and his wife. As to the propriety of summary judgment on the merits of the plaintiffs' underlying claim, we find the plaintiffs have satisfied their burden to come forward with sufficient evidence to establish the essential elements of a legal malpractice cause of action; thus, they are entitled to go forward with their claim.

## FACTS

The plaintiffs lived across the street from their friends of many years, Richard and Marlene Brown. Richard had been the plaintiffs' attorney for over 30 years in a variety of business matters. Both couples, along with Roy and Marcia Westhoff, were Quixtar distributors. Quixtar was a multilevel marketing company. Relevant here, the plaintiffs had built up quite a successful Quixtar business, which in 2006 generated income for the plaintiffs in an amount of $23,290. The parties referred to this income as "mailbox money" because the sales generating this income were transacted not by the plaintiffs themselves, but by a number of distributors at successively lower levels.

At all times relevant to this lawsuit, Quixtar prohibited its distributors from participating in any other multilevel marketing business while acting as a distributor for Quixtar and required any distributor who sold or terminated a Quixtar business to wait 6 months before entering into another multilevel marketing business. Additionally, former Quixtar distributors were not allowed to solicit their Quixtar contacts for purposes of involvement with another multilevel company for 2 years after leaving Quixtar.

In late 2006, the plaintiffs, the Browns, and the Westhoffs were presented with an opportunity to participate in XanGo, a multilevel juice and supplement marketing company. All three couples were interested in XanGo but had concerns because of rumors that various Quixtar distributors found to have violated their noncompete agreement by becoming involved in other multilevel marketing businesses had been forced to relinquish their Quixtar distributorships. The three couples later met to discuss whether they should get involved with XanGo and whether doing so would violate the Quixtar noncompete restrictions.

After this initial meeting, Richard obtained a copy of Quixtar's compendium, which contained all the Quixtar rules and regulations. Thereafter, the three couples met again. Richard informed the group that in order to become involved with XanGo without violating Quixtar's restrictions, each couple would need to set up a corporation owned by a straw man to set up and manage the XanGo business so that ownership could not be traced back to any of the couples. Because the plaintiffs' Quixtar business was so lucrative, Richard specifically told them that they should enter into a false sale of their Quixtar business to another straw man. Richard advised the plaintiffs that it was important that they pick individuals they could really trust in connection with the formation of the XanGo business and the false sale of the Quixtar business. After some discussion, the parties decided that plaintiffs would "sell" their Quixtar business to the Browns, their direct up-line Quixtar distributor, because Quixtar required the plaintiffs to first offer the business to their direct up-line distributor. The parties thought this arrangement was best because the Quixtar higher-ups, or "diamonds," would "have their eyes on [the plaintiffs]," and a sale to the Browns would not "stir up a lot of stuff with the diamonds."

On January 18, 2007, the plaintiffs and the Browns executed an Independent Business Sale Agreement pursuant to which the plaintiffs "sold" their Quixtar business to the Browns for $36,550.22. As was required, the agreement subsequently was approved by Quixtar. Significant for purposes of summary judgment, the parties agreed that they understood that the written agreement would not be an actual sale and that the Browns would forward all earnings received to the plaintiffs "forever." In connection with the false sale and as an additional measure to avoid violating Quixtar's noncompete provisions, the plaintiffs established GreenTree Corporation in the name of Sara's father, George Miller, to manage the XanGo business. Richard prepared GreenTree's incorporation papers and submitted them to the Kansas Secretary of State on the letterhead of his law firm, Brown, Isern & Carpenter. Richard also prepared a stock purchase agreement allowing the plaintiffs to purchase the corporation from Miller after expiration of the 6-month noncompete period.

Both parties to the sales agreement actively participated in XanGo until April or May 2007, when the Westhoffs got into trouble with Quixtar for soliciting Quixtar customers for their XanGo distributorship. Daniel and Richard were not happy about the Westhoffs getting caught by Quixtar because they did not want any red flags. Thereafter, the plaintiffs ceased all local XanGo business because they were worried about getting into trouble with Quixtar like the Westhoffs.

From March 15, 2007, to July 15, 2008, the Browns deposited payments received from Quixtar into the plaintiffs' bank account. The Browns made no more payments to the plaintiffs after July 2008.

On November 9, 2009, the plaintiffs filed suit against Richard, Marlene, and Brown, Isern & Carpenter, alleging breach of fiduciary duty, fraud and fraudulent inducement, breach of contract, promissory estoppel, tortious interference with existing contractual relations, tortious interference with prospective business advantage or relationship, and negligence/legal malpractice. The plaintiffs claimed that Richard, as their attorney, advised them to enter into a false sale of their business to Richard and Marlene in order to legitimize the plaintiffs' future involvement in XanGo, but the Browns had wrongfully retained plaintiffs' Quixtar earnings since August 2008. The defendants answered, generally denying the plaintiffs' allegations and claiming the Browns had legitimately purchased the plaintiffs' business for fair market value.

The plaintiffs later dismissed all claims except for legal malpractice and breach of contract. Relying on the doctrines of in pari delicto and illegality, the defendants moved for summary judgment on grounds that the plaintiffs' own knowledge of and participation in circumventing the Quixtar noncompete clause barred them from recovering damages on their claims. The defendants further argued that the plaintiffs could not prove that the defendants were guilty of any professional negligence and, even if they could, the plaintiffs could not prove the alleged negligence caused the damages claimed.

Thereafter, the plaintiffs dismissed Marlene as a defendant and dropped the breach of contract claim. Following argument, the

district court granted summary judgment in favor of the defendants on the legal malpractice claim based on the doctrines of in pari delicto and illegality. In so doing, the court determined that the parties had committed equal wrongs with respect to their efforts to circumvent the Quixtar noncompete agreement, regardless of any attorney-client or fiduciary relationship between the parties. Given its decision, the court found it unnecessary to address whether the undisputed facts established that the defendants were entitled to judgment as a matter of law with respect to the substantive claim of legal malpractice. The plaintiffs appeal.

## STANDARD OF REVIEW

When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law and summary judgment is appropriate. The district court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, the adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011).

" 'An issue of fact is not genuine unless it has legal controlling force as to the controlling issue. The disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact. [Citation omitted.]' " *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 [1999]).

See *Hall v. Shelter Mutual Ins. Co.*, 45 Kan. App. 2d 797, 800, 253 P.3d 377 (2011), *rev. denied* 293 Kan. 1106 (2012).

ANALYSIS

## In pari delicto

The plaintiffs argue the district court erred in holding, as a matter of law, that the doctrine of in pari delicto prohibits them from recovering damages against the defendants for legal malpractice. Specifically, the plaintiffs contend that when considered in a light most favorable to them—as the party opposing summary judgment—the evidence submitted by the parties establishes at least two disputes of material fact that would affect the outcome at trial. The first dispute identified by the plaintiffs is the question of whether the actions taken by the plaintiffs to circumvent the Quixtar noncompete agreement even qualify as wrongdoing for purposes of invoking the doctrine of in pari delicto as a defense to recovering damages in this suit for legal malpractice. If the finder of fact resolves this first dispute in favor of the defendants, the second factual dispute identified by the plaintiffs is whether their actions were wrongful enough to equal or outweigh Richard's wrongful conduct for purposes of invoking in pari delicto as a defense to recovery. Thus, the crux of the plaintiffs' argument is that the court's decision to grant summary judgment based on a finding that the parties were in pari delicto was premature, because it is the role of the jury, not the court, to determine whether the plaintiffs engaged in any misconduct and, if so, to weigh that misconduct against Richard's misconduct. For the reasons set forth below, we agree.

The doctrine of in pari delicto is the "principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law Dictionary 862 (9th ed. 2009).

"The common-law defense of in pari delicto prohibits a party from recovering damages arising from misconduct for which the party bears responsibility[,] bears fault, or which resulted from his or her wrongdoing. Thus, relief will be denied where the parties are shown to have been in pari delicto or to have acted with the *same* degree of knowledge as to the illegality of the transaction. The law will leave the parties just in the condition in which it finds them." (Emphasis added.) 27A Am. Jur. 2d, Equity § 103, pp. 641-42.

Particularly relevant to the issue presented here, the in pari delicto doctrine applies only when " 'the wrong of the one party *equals* that of the other.' " (Emphasis added.) *Goben v. Barry*, 234 Kan. 721, 727, 676 P.2d 90 (1984) (quoting 27 Am. Jur. 2d, Equity § 141, p. 676). As such, the wrongful acts of each party must be weighed in order "to avoid allowing an overwhelmingly offensive act of the defendant to stand merely because the plaintiff's conduct was also wrongful, although slight." 234 Kan. at 727.

In this case, the district court weighed the wrongful acts of each party and concluded that the parties were equally responsible for any damages sustained by the plaintiffs as a result of those acts.

"The Zimmermans and Browns stood on equal ground and their interests came together in agreement and relative positions. Both were long-time Quixtar distributors and each built up a good business. Both were approached together by a XanGo recruiter. Both wanted to participate in XanGo and Quixtar at the same time and receive money from both businesses. Both sought to avoid Quixtar restrictions and the loss of income from their Quixtar businesses. Both sought to avoid detection of their arrangements by Quixtar."

As they did in their briefing to the district court, the plaintiffs once again argue that Richard's culpability, as an attorney, is far greater than their culpability as clients who engaged in misconduct at the direction of their attorney. With regard to this argument, the district court agreed that Richard's participation as an attorney in the misconduct was a factor to be considered in this case to determine whether the parties stood in parity with each other.

"It is true that [Richard] is an attorney and the others are not. It does not necessarily follow however, *considering all the undisputed facts in this particular unique situation in which all three couples found themselves*, that [Richard] was in an unequal (higher) or fiduciary relationship with the other parties. The parties were in parity . . . .

. . . .

"The issue of whether or not plaintiffs sought out [Richard] as a friend or as an attorney is only relevant, if what they claim is true, to discover whether or not they acted together on equal footing in their attempt to avoid their obligations to Quixtar. The Court has determined that they stood in parity."

We agree with the district court that the fiduciary relationship between the parties does not automatically render Richard's wrongful actions in deceiving Quixtar more blameworthy than the

plaintiffs' actions but, instead, is a fact that must be considered along with all of the other facts in comparing the culpability of the parties. Nevertheless, it does not appear that the district court did, in fact, consider the fiduciary relationship between the parties in assessing the wrongfulness of the acts in which each of the individual parties engaged in their attempt to avoid their obligations to Quixtar. Since we are in as good a position as the district court to review the record on a motion for summary judgment, we could reassess the culpability of the parties and consider the fiduciary relationship between the parties as part of that assessment. We decline to do so, however, because—as the following discussion demonstrates—the record on summary judgment reveals several disputes of material fact that must be resolved by a jury before the court can determine, as a matter of law, whether the in pari delicto defense applies to prohibit the plaintiffs from recovering damages.

We begin our discussion by acknowledging that the record on summary judgment reflects the following uncontroverted facts. Both parties were long-time Quixtar distributors. Both had built up a good business over the years and were receiving significant mailbox money as a result. Both were approached together by a XanGo recruiter. Both wanted to participate in XanGo and Quixtar and receive money from the two businesses at the same time. Both sought to avoid Quixtar restrictions and the loss of income from their Quixtar businesses. And finally, both sought to avoid detection of their arrangements by Quixtar. From these uncontroverted facts it appears—as the defendants assert—that the objective of both parties was to avoid their contractual obligations to Quixtar. But the fact that both parties may have had the same objective does not necessarily mean that the conduct in which each of the individual parties engaged to achieve that objective was wrongful and/or weighed equally.

Regarding the propriety of the conduct in which they engaged, the plaintiffs assert that they never believed that they were doing anything morally or ethically wrong when they sold their Quixtar business to the Browns on paper only and created a new corporation for their XanGo business. The defendants dispute this factual assertion but argue this dispute does not preclude summary

judgment in their favor because the dispute is supported by sham testimony created by the plaintiffs for the sole purpose of avoiding summary judgment. Specifically, the defendants maintain the plaintiffs' assertion is supported only by a "self-serving" statement in Daniel's deposition and is contradicted by other statements made by Daniel earlier in the deposition in which he acknowledged that he and Sara did not want Quixtar to know that they had sold their Quixtar business to the Browns on paper only and had created a new corporation for their XanGo business. Because it granted summary judgment in favor of the defendants, it appears the district court found Daniel's testimony that he and his wife did not believe they engaged in unethical conduct was insufficient to create a genuine issue of material fact.

Upon review of the relevant portions of the transcript from Daniel's deposition testimony, however, we find the statements perceived by the defendants as inconsistencies are not the sort of contradictory sworn statements that Kansas courts have held insufficient to avoid summary judgment. "Sham testimony" in that context occurs when an affidavit is created to contradict information found in previous sworn statements in order to create an issue of material fact and defeat a motion for summary judgment. See *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 313-14, 756 P.2d 416 (1988); *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 45-46, 661 P.2d 348 (1983). To that end, we see no contradiction between the plaintiffs' attempt to avoid detection by Quixtar in order to circumvent the limitations of the noncompete agreement and the plaintiffs' asserted good-faith belief based on their attorney's advice that they were not doing anything unethical or otherwise impermissible according to the Quixtar noncompete agreement. The plaintiffs readily acknowledge that they wanted to participate in XanGo, but Richard, as their long-time attorney, specifically advised the plaintiffs that without selling their Quixtar business they would be violating their noncompete agreement with Quixtar. Thereafter, Richard urged the plaintiffs, as their attorney and a beneficiary of the prospective transaction, to sell their business to he and his wife "on paper" and start another company in the name of a third party to avoid detection by Quixtar and circumvent the limitations of the

noncompete agreement. Given the way in which Richard presented the proposal (that the plaintiffs would be in violation of the noncompete agreement unless they followed this advice), the plaintiffs assert they never believed that they were engaging in any impermissible act under the terms of the Quixtar noncompete agreement. The plaintiffs maintain they were simply given a step-by-step plan to structure their businesses and were sternly warned by Richard to avoid detection by Quixtar so that they would not have any disputes with their up-line distributors.

The plaintiffs' contention that they did not believe they were engaging in unethical conduct finds support in evidence other than Daniel's testimony as well. The plaintiffs assert Richard's position as an attorney is a significant factor that must be considered in assessing the parties' relative appreciation of the wrongfulness of the acts in which each of the individual parties engaged in their attempt to avoid their obligations to Quixtar. Specifically, the plaintiffs contend that, as an attorney, Richard fully appreciated the legal impropriety of devising and executing the January 18, 2007, Independent Business Sale Agreement pursuant to which the plaintiffs "sold" their Quixtar business to the Browns for $36,550.22 while agreeing orally that the transaction would not be an actual sale of the plaintiffs' business but, instead, the Browns would forward all earnings received to the plaintiffs "forever." As an attorney, Richard also appreciated the legal effect of the written transaction on he and his wife's ability to own and control the monthly mailbox money generated and on he and his wife's ability to claim legal ownership of the distributorship, regardless of any oral agreement to the contrary.

Notably, the district court neither acknowledged nor determined to what extent a disparity in the parties' relative appreciation of the wrongfulness of the transactions at issue was material to a decision regarding whether the in pari delicto doctrine applied in this case. But it is reasonable to infer from Richard's 30-plus years' experience as a practicing attorney that he has extensive knowledge regarding the formation and enforcement of contracts and the mechanisms through which his clients will act under his direction. It also is reasonable to infer that lay persons may be confused about the

legality of sham transactions employed to avoid contractual obligations such as the one presented here. This is especially true here given that Daniel testified he had only a high school education. Viewing the evidence in a light most favorable to the plaintiffs, as we must do on summary judgment, we find that a dispute of material fact exists with respect to the parties' relative appreciation of the wrongfulness of their actions and that resolution of this factual dispute bears on applicability of the in pari delicto doctrine as a defense to bar the plaintiffs from recovering damages for legal malpractice. When such a dispute of material fact exists, it is the role of the jury, not the court, to determine whether the plaintiffs' actions were wrongful and, if so, whether they were wrongful enough to equal or outweigh Richard's wrongful conduct for purposes of invoking in pari delicto as a defense to recovery.

Before closing on this issue, we believe it is appropriate to specifically note what we *do not* find in this case. We *do not* find applicability of the in pari delicto doctrine to be an issue that can never be resolved on summary judgment. We *do not* find that the defense of in pari delicto will be inapplicable after the disputes of material fact in this particular case are resolved by a jury. We merely find that the plaintiffs have satisfied their burden to provide evidence sufficient to create a factual dispute regarding the parties' relative appreciation of the wrongfulness of their actions and that this factual dispute is material to the outcome of this case because its resolution bears directly on whether the in pari delicto doctrine applies to prohibit the plaintiffs from recovering damages from the defendants for legal malpractice.

*Illegality*

As an alternative to in pari delicto, the defendants argue the doctrine of illegality applies to prohibit the plaintiffs from recovering damages from the defendants for legal malpractice. "An illegal contract is a promise that is prohibited because the performance, formation, or object of the agreement is against the law. [Citation omitted.]" *Petty v. City of El Dorado*, 270 Kan. 847, 853, 19 P.3d 167 (2001). In this case, the defendants did not allege, let alone present any evidence to establish, that the contract for sale

of the plaintiffs' business to the defendants violated any law. Instead, the defendants allege that the plaintiffs' deceptive use of otherwise lawful means to avoid contractual commitments to others is against public policy and thereby renders the underlying business sale agreement, and all rights arising from it, unenforceable. See *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 39, 59 P.3d 1003 (2002) (a contract that is illegal or against public policy is unenforceable under Kansas law).

The public policy of a state is the law of that state as found in its constitution, its statutory enactments, and its judicial decisions. *McAllister v. Fair*, 72 Kan. 533, 540, 84 P. 112 (1906), *superceded by statute on other grounds as stated in In re Foster's Estate*, 182 Kan. 315, 316-17, 320 P.2d 855 (1958). But the defendants fail to cite to any constitutional principle, statutory provision, or judicial decision to support their allegation that the contract for sale of the plaintiffs' Quixtar business to the Browns contravenes public policy. In fact, the defendants have failed to even allege, let alone provide any evidence to establish, that the contract for sale of the plaintiffs' Quixtar business to the defendants (which the parties agree for purposes of summary judgment required the defendants to make monthly payments forever) is in any way contrary to the terms and conditions of the Quixtar distributor agreement between the plaintiffs and Quixtar.

Even if the defendants had submitted sufficient facts and relevant law to establish the sales contract here violated Kansas public policy, we fail to see how the doctrine of illegality would apply to prohibit the plaintiffs from recovering damages for legal malpractice. Notably, it is the defendants, not the plaintiffs, who are in favor of preserving the terms and conditions of the underlying sale agreement. Thus, the defendants' position on this issue outside the context of summary judgment—that their purchase of the plaintiffs' business is legally binding—is in direct conflict with their stated position that the sale agreement is unenforceable because it violates public policy. If we agree with the defendants on the position they have taken on summary judgment here, we would be required to strike down the sale agreement as void, which neces-

sarily would place the parties in the respective positions they held prior to the sale.

Even if we were to ignore the fact that the defendants essentially are arguing on summary judgment that the sales contract is void, the defense of illegality would still be inapplicable to the specific facts presented here. For a defendant to properly assert an illegality defense in a tort action, it must prove that the illegal act was the proximate cause of the plaintiff's injury. *Beggerly v. Walker*, 194 Kan. 61, 66-67, 397 P.2d 395 (1964). Although in the context of proving negligence instead of an illegality defense, our Supreme Court has defined proximate cause as that "cause 'which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act.' " *Rhoten v. Dickson*, 290 Kan. 92, 114-15, 223 P.3d 786 (2010) (quoting *Yount v. Deibert*, 282 Kan. 619, 624-25, 147 P.3d 1065 [2006]). To satisfy the burden of proof on the causation element, the party who bears that burden must produce evidence that " ' "affords a reasonable basis for the conclusion that it is *more likely than not* that the conduct of the defendant was a cause in fact of the result." ' " 290 Kan. at 115 (quoting *Yount*, 282 Kan. at 628).

In support of proximate cause, the defendants argue there could be no legal malpractice action in the absence of the underlying sales contract. By posting it as a "but for" argument, the flaw in that argument becomes clear. In retrospect, it can often be said that, but for a certain fact, damages would not have been sustained. For purposes of proximate cause, however, the inquiry must go beyond this "but for" analysis; the damages sustained must also be an ordinary and natural consequence of the wrongful conduct. *Aguirre v. Adams*, 15 Kan. App. 2d 470, 474, 809 P.2d 8 (1991). "Natural and probable consequences are those which human foresight can anticipate because they happen so frequently they may be expected to recur. [Citation omitted.]" *Norton Farms, Inc. v. Anadarko Petroleum Corp.*, 32 Kan. App. 2d 899, 904-05, 91 P.3d 1239 (2004). Whether a party has established proximate cause is

ordinarily a question of fact. *Hale v. Brown*, 287 Kan. 320, 324, 197 P.3d 438 (2008).

In order to preclude the plaintiffs from recovering damages for legal malpractice based on illegality in this case, the defendants must establish as a matter of law that the damages sustained by Richard's alleged breach of fiduciary duty (the failure to advise the plaintiffs to explore the need for independent counsel under circumstances where Richard was acting both as attorney to the plaintiffs and a party to the sales transaction) was a natural and probable consequence of the plaintiffs' decision to sell their Quixtar business to the Browns. The defendants have failed to satisfy that burden.

### Attorney Malpractice

Having determined that the district court's decision to grant summary judgment in favor of the defendants based on the doctrines of in pari delicto and illegality were premature and improper, respectively, we now address the defendants' argument that the plaintiffs failed to come forward with sufficient evidence to establish the essential elements of a legal malpractice cause of action.

In order to prevail on a legal malpractice claim, a plaintiff is required to prove: (1) the duty of the attorney to exercise ordinary skill and knowledge, (2) a breach of that duty, (3) a causal connection between the breach of duty and the resulting injury, and (4) actual loss or damage. *Canaan v. Bartee*, 276 Kan. 116, 120, 72 P.3d 911, *cert. denied* 540 U.S. 1090 (2003).

#### Duty

The plaintiffs contend in their petition that Richard had served as their attorney for nearly 30 years and was acting in that capacity during all times relevant to the transactions at issue in this case. In the pretrial order, the parties agreed that the issue of whether Richard was acting as the plaintiffs' attorney in conjunction with the transactions at issue was a question of fact. Consistent with the pretrial order, the defendants did not seek summary judgment on this particular question. Viewing the evidence in a light most favorable to the plaintiffs, we assume for purposes of summary judgment that Richard was acting as the plaintiffs' attorney with respect to the transactions at issue.

The duty of an attorney to his or her client is well established in Kansas and has been held by our Supreme Court to be a relationship "fiduciary in character, binding the attorney to the highest degree of fidelity and good faith to his client on account of the trust and confidence imposed." *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, Syl. ¶ 3, 553 P.2d 254 (1976). Based on the fact that Richard acted as both their attorney and a party to the Quixtar business transaction, the plaintiffs alleged Richard had a duty to advise them to seek the advice of independent counsel and breached that duty by failing to do so.

But the defendants argue there is insufficient evidence in this case from which a jury could find the defendants had a duty to advise the plaintiffs to seek independent counsel. Specifically, the defendants assert that the plaintiffs and plaintiffs' expert have relied exclusively on the Kansas Rules of Professional Conduct (KRPC) to establish that such a duty exists; however an attorney's violation of the KRPC does not, in and of itself, create a legal duty upon which a civil cause of action for negligence can be based. See *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, Syl. ¶ 1, 220 P.3d 333 (2009); Kansas Supreme Court Rule 226 (preamble [20]) (2012 Kan. Ct. R. Annot. 431).

We agree that the ethical rules in Kansas do not create a legal duty upon which a negligence action can be based. Instead, the existence of a duty must independently arise from common law. Attorney conduct which violates an ethical rule, however, may also violate an independent legal duty. In such a case, it is the violation of the independent legal duty that gives rise to a tort cause of action, while the ethical rule reflects the governing standards of conduct by which an attorney is measured. To that end, and independent of the ethical rules governing attorney conduct in Kansas, we find the attorney-client relationship between the parties in this case is sufficient to establish the existence of Richard's legal duty, fiduciary in character, binding him "to the highest degree of fidelity and good faith to his client on account of the trust and confidence imposed." *Ford*, 220 Kan. 244, Syl. ¶ 3.

*Breach*

The next element of a legal malpractice claim is proving a breach of the duty created by the fiduciary relationship between attorney and client. See *Canaan*, 276 Kan. at 120. To prove breach, a plaintiff must establish that the defendant attorney deviated from the professional standards of conduct applicable to the type of practice in which the defendant attorney practices law. Testimony from an expert in that particular area of law is generally required to prove the standard of conduct by which the professional actions of the attorney are measured and whether the attorney deviated from the appropriate standard. *Leeper v. Schroer, Rice, Bryan & Lykins, P.A.*, 241 Kan. 241, 246, 736 P.2d 882 (1987); PIK Civ. 4th 123.44.

In opposing the defendants' motion for summary judgment, the plaintiffs presented the opinion of John Terry Moore, a trial attorney practicing in Wichita, Kansas, who has experience representing both plaintiffs and defendants in legal malpractice cases. Based on his experience and his review of the relevant evidence, Moore presented his opinion that the defendants owed a duty to the plaintiffs as their clients and that they breached this duty by "failing to use the degree of care and skill that a reasonably competent attorney practicing in the state of Kansas would have used in similar circumstances." Specifically, Moore identified the following conduct, in pertinent part, as the basis for his opinion regarding that breach:

- Richard's failure to explain to the plaintiffs that there was an inherent conflict of interest in entering into a contract or agreement with the attorney who was representing them in that very same transaction and the failure to obtain a written informed consent to waive the conflict.
- Richard's failure to advise his clients, in writing, of the risk of entering into a contract or agreement with the attorney who was representing them in that very same transaction without seeking the advice of independent legal counsel.
- Richard's use of information gleaned in representing the plaintiffs to the plaintiffs' detriment without written informed consent.
- Richard's failure to withdraw as counsel for the plaintiffs before engaging in negotiations and ultimately purchasing the plaintiffs' business.

We find Moore's expert opinion is sufficient evidence from which a jury could find that the defendants owed a duty to the plaintiffs as their clients and that they breached this duty by failing to use the degree of care and skill that a reasonably competent attorney practicing in the state of Kansas would have used in similar circumstances.

*Causation*

The defendants assert that there is insufficient evidence from which a jury could find that the plaintiffs' alleged damages were caused in any way by Richard's negligence in preparing and/or participating in the Independent Business Sale Agreement dated January 18, 2007. But the defendants misconstrue the plaintiffs' assertions regarding the cause of the damages they allegedly sustained. Specifically, the plaintiffs assert that they would not have gone through with the sale of their business to the Browns if Richard had adequately satisfied his legal duty to inform them of the conflict of interest presented by the sale of their business to the attorney representing them in the transaction and his legal duty to advise them to seek the advice of independent counsel before entering into that agreement. To support this assertion, the plaintiffs offered as evidence the opinion of Moore, who stated that Richard's breach of his duties caused the plaintiffs to sustain damages in the form of lost compensation and business development opportunities. The plaintiffs also offered as evidence the expert opinion of Gary Baker, Ph.D., an economist. Relying on the historical earnings of the plaintiffs' Quixtar business and projecting those earnings out over a period of 30 years, Dr. Baker calculated the damages sustained by the plaintiffs range from a low of $751,665 to a high of $1,503,330. Based on these submissions, we find sufficient evidence from which a jury could find that the plaintiffs suffered damages and that these damages were caused by the defendants' breach of legal duty.

Reversed and remanded.