No. 114,986

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of
ADDIS KIDANE,
*Appellant*,

and

HELEN ARAYA,
*Appellee.*

SYLLABUS BY THE COURT

1.

Annulment is a judicial determination to set aside a marriage which was invalid at its inception because of some defect existing at the time of the marriage.

2.

A divorce dissolves a lawfully established marriage.

3.

A void marriage is a marriage that is invalid from its inception, that cannot be made valid, and that can be terminated by either party without obtaining a divorce or annulment.

4.

A voidable marriage is a marriage that is initially invalid but that remains in effect unless terminated by court order.

**5.**

A sham marriage is a purported marriage in which all the formal requirements are met or seemingly met but in which the parties go through the ceremony with no intent of living together as husband and wife.

**6.**

A green card marriage is a slang term for a sham marriage in which a United States citizen marries a foreign citizen for the sole purpose of allowing the foreign citizen to become a permanent United States resident.

**7.**

Sham marriages are voidable under K.S.A. 2015 Supp. 23-2702(b).

**8.**

Annulment proceedings are no longer equitable in nature. Such causes of action are now governed solely by statute.

Appeal from Johnson District Court; DAVID W. HAUBER, judge. Opinion filed January 13, 2017. Affirmed.

*Rachelle Worrall*, of Prairie Village, for appellant.

*Courtney J. Whiteley*, of Whiteley Law Office, of Overland Park, for appellee.

Before STANDRIDGE, P.J., ARNOLD-BURGER and BRUNS, JJ.

ARNOLD-BURGER, J.: K.S.A. 2015 Supp. 23-2702(b) allows a court to grant an annulment for any "reason justifying recission of a contract of marriage." After finding that Addis Kidane and Helen Araya entered into a marriage for the purposes of immigration fraud, the district court granted Araya's request for an annulment. Kidane

2

appealed, arguing that the district court's finding of fraud was not supported by substantial competent evidence. Kidane also argues that annulment, an equitable remedy, is improper where the requesting party had unclean hands. Because we find that the facts support the district court's conclusion that this was a marriage entered into for the purpose of immigration fraud and because we find, as a matter of first impression, that such marriages are voidable under Kansas law, we affirm the district court's decision. Moreover, we find that the clean hands doctrine does not apply in this case.

FACTUAL AND PROCEDURAL HISTORY

On March 5, 2015, Araya filed a complaint in Clark County, Nevada, requesting an annulment from Kidane. In the complaint, Araya said that she met Kidane shortly after his arrival in the United States in 2012 and they "agreed that they would live together as husband and wife, build a life together in the U.S., as [Kidane] professed love to [Araya] many times throughout the courtship, and was overly kind and attentive to her young daughter from a previous relationship." But, Araya said that once they were married Kidane "told [Araya] he did not need her anymore because he had his 'green card'." The Nevada court dismissed this complaint on the basis of inconvenient forum. On March 6, 2015, Kidane filed for divorce in Johnson County on the basis of incompatibility. Araya responded with a counter-petition for annulment. In this petition Araya stated the basis for annulment was that Kidane was married to someone else at the time he married Araya, making their marriage void.

The case proceeded to bench trial. Much of the testimony conflicted. Kidane said that he came to the United States from Ethiopia in 2012 to look for his ex-girlfriend, Yodit Tesfaye. Tesfaye testified that Kidane was her husband and that they had a traditional Ethiopian wedding in 2011. Photos from the alleged marriage depict Kidane wearing a tuxedo and Tesfaye wearing a wedding dress, with rings on their left ring fingers. Tesfaye also testified, however, that prior to her Ethiopian marriage to Kidane,

3

she was married to James Nujong in the United States. She said that when she married Kidane, she was separated from Nujong (although not divorced). She thought it was okay in Ethiopia to get married to a new person while still married to a former partner and that no paperwork was necessary for divorce or marriage. Kidane described the event differently. He testified that he had never been married before marrying Araya. Kidane called the event with Tesfaye "a celebration of a marriage agreement." Kidane acknowledged that there was a priest at the occasion, but that the priest's role was only to bless the food and people at the celebration. Kidane said that the rings on his and Tesfaye's left ring fingers were engagement rings. When asked why they did not get married when they had a celebration, Kidane responded, "[Tesfaye] told me our family are getting older and weak, we have to do the celebration, but we're going to get married when we get to America."

After the ceremony, Tesfaye moved to the United States and Kidane remained in Ethiopia to work on a house owned by Tesfaye. Tesfaye sent Kidane money every month to support him. Eventually, Tesfaye paid for Kidane to come to the United States. When Kidane arrived in the United States, he says that Tesfaye was at the airport with her husband, Nujong, and that Tesfaye told Kidane, "I'm sorry, I'm already married. From now on we cannot live together." Tesfaye testified that she intended to marry Kidane when he arrived in the United States and after Tesfaye finalized her divorce from Nujong. But, she says that this plan failed because Kidane "disappeared" soon upon arriving in the United States.

Tesfaye introduced Kidane to Araya in October 2012. Kidane testified that when he first arrived in the United States, he lived in a house with Tesfaye, Nujong, Araya, and Araya's daughter. However, Tesfaye testified that Kidane lived with her when he first arrived in the United States, but that Nujong, Araya, and Araya's daughter did not live with her. Araya also testified that she did not live with Tesfaye when Kidane arrived in October 2012.

Kidane and Araya married in Las Vegas in January 2013. Kidane testified that he married Araya "[b]ecause [he] loved her." Araya said that they did not go to Las Vegas to get married, only "to have fun." Araya said that while she and Kidane were in Las Vegas, Kidane asked Araya to marry him and she "was drunk and then [she] just did it." When asked what the purpose was in her marriage to Kidane, Araya testified that Kidane asked her to help him with his green card. Prior to the marriage, Araya and Kidane consulted with an immigration attorney.

Araya testified that she did not reside with Kidane before or after their Las Vegas marriage. Araya acknowledges that she signed two leases with Kidane, but says she never actually resided with him. Araya also testified that her daughter had only ever lived with Araya. Kidane testified that he and Araya rented property and lived together for 2 1/2 years. Kidane said that Araya's daughter slept at Tesfaye and Nujong's house or that she lived with Araya at Araya's work (Araya was taking care of an elderly woman at the time). Kidane did not know Araya's daughter's full name, only her first name, and he also did not know where Araya's daughter went to school.

A few months after marrying Araya, Kidane returned to Ethiopia so that he could give Tesfaye her house. He was gone for 5 months. Araya testified that at some point, it is not clear when, Kidane told Araya that he was already married to Tesfaye. Araya filed for annulment in March 2015. When asked why she did not just get a divorce, Araya said "[b]ecause it's not right what I am doing. . . . And I know this is illegal, so I just want to—I just want to decide to annul this marriage." Araya was also asked why, in her petition for annulment in Nevada, she said that Kidane professed his love to her and was attentive to her daughter when she was now testifying to a different story. Araya replied, "Because I realize that what I'm doing is wrong, because I never have relationship with [Kidane] and that I never have—I never consummated this marriage with [Kidane]. As what I'm doing is wrong. I just want to done this, the anul [*sic*] and then finish."

5

After listening to the testimony, the court granted Araya's request for an annulment. The court stated:

"Well, at this point the Court is going to grant the annulment because I think both parties have participated in fraud on this Court; in fact, it's a felony. What you did was a felony. You allowed what is clearly a fraud on the U.S. Government in order for him to obtain a green card.

"I don't find that the parties—that Mr. Kidane was married to [Tesfaye]. She clearly is married to someone else, so he couldn't—I don't care what the cultural claims are here. He couldn't have married her.

"But what's clear to me is that there's so many problems in this case with credibility; I don't believe either party, frankly. I don't believe that—we had people here who were going through a marriage and then we have claims by Ms. Araya that she never lived or consummated the marriage, never lived with him. He's claimed that he loved her, but then we have professions of love for a marriage that, apparently, didn't exist under U.S. law.

"So far as I'm concerned, nothing was legal from day one in this case. So the annulment is granted, but it's granted with the reluctance of the Court. I think both parties come to this court with unclean hands."

Kidane appealed.

## ANALYSIS

Kidane makes two arguments that the trial court erred in granting Araya an annulment. First, he argues that the district court's finding of fraud was not supported by substantial competent evidence. He states that Araya "requested the annulment and therefore had the burden of establishing that the marriage was void or induced by fraud,

6

which required clear and convincing evidence." Second, he argues that annulment is an improper remedy when the requesting party has unclean hands.

K.S.A. 2015 Supp. 23-2702 establishes grounds for annulment. It states:

"(a) The district court shall grant a decree of annulment of any marriage for either of the following grounds: (1) The marriage is void for any reason; or (2) the contract of marriage is voidable because it was induced by fraud.

"(b) The district court may grant a decree of annulment of any marriage if the contract of marriage was induced by mistake of fact, lack of knowledge of a material fact or any other reason justifying recission of a contract of marriage." K.S.A. 2015 Supp. 23-2702.

"Annulment is a judicial determination to set aside a marriage which was invalid at its inception because of some defect existing at the time of the marriage." 1 Elrod, Kansas Law & Practice: Kansas Family Law § 9:48 (2015-16 ed.) (citing *In re Estate of Crump*, 161 Kan. 154, 159, 166 P.2d 684 [1946]). On the other hand, a divorce dissolves a lawfully established marriage. 161 Kan. at 159-60. As noted in K.S.A. 2015 Supp. 23-2702, grounds for annulment exist when a marriage is void or voidable. A void marriage is "[a] marriage that is invalid from its inception, that cannot be made valid, and that can be terminated by either party without obtaining a divorce or annulment." Black's Law Dictionary 1120 (10th ed. 2014). A voidable marriage is "[a] marriage that is initially invalid but that remains in effect unless terminated by court order." Black's Law Dictionary 1120 (10th ed. 2014).

7

*The district court did not find that the annulment of the marriage was based on fraud as envisioned in K.S.A. 2015 Supp. 23-2702(a)(2).*

K.S.A. 2015 Supp. 23-2702(a) contains a mandate—if the court finds that the marriage was induced by fraud it *shall* grant a decree of annulment. Fraud (1) is never presumed, (2) must be established by clear and convincing evidence, and (3) is normally a question of fact. *Alires v. McGehee*, 277 Kan. 398, Syl. ¶¶1-2, 85 P.3d 1191 (2004). An appellate court reviewing a determination which is required to be based upon clear and convincing evidence considers whether, after review of all the evidence viewed in the light most favorable to the party with the burden of proof, it is convinced that a rational factfinder could have found the determination to be highly probable. In reviewing the factual findings, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 697, 705, 187 P.3d 594 (2008).

On appeal, Kidane focuses solely on K.S.A. 2015 Supp. 23-2702(a)(2) because he argues that it was erroneous for the district court to base its decision on a finding of fraud. He does not address K.S.A. 2015 Supp. 23-2702(b), nor whether the marriage was void from its inception under K.S.A. 2015 Supp. 23-2702(a)(1).

"The elements of fraud are 'an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment.'" *In re Marriage of Chastain*, No. 112,903, 2015 WL 9287032, at *2 (Kan. App. 2015) (unpublished opinion) (quoting *Alires*, 277 Kan. 398, Syl. ¶ 3). For the district court to have granted an annulment on the basis of fraud under K.S.A. 2015 Supp. 23-2702(a)(2), Araya needed to provide clear and convincing evidence that Kidane made an untrue statement to her with the intent to inducing her into marriage. Araya would also need to show that she relied on statements by Kidane in agreeing to marry him.

8

It is clear that the district court did not grant the annulment on the basis of fraud as envisioned by K.S.A. 2015 Supp. 23-2702(a)(2). The district court judge stated that he believed "nothing was legal from day one in this case." This is supported by Araya's testimony that the purpose of the marriage was to help Kidane obtain a green card. If Araya knew that Kidane was trying to get a green card, then Kidane could not have fraudulently induced Araya to marry because she already knew the truth of his intentions.

The remaining two options under which the district court could statutorily grant an annulment were a finding that the marriage was void under K.S.A. 2015 Supp. 23-2702(a)(1) or a finding that the marriage was voidable under K.S.A. 2015 Supp. 23-2702(b).

Here, the district judge granted the annulment because he thought the parties "participated in fraud on this Court; in fact, it's a felony. What you did was a felony. You allowed what is clearly a fraud on the U.S. Government in order for him to obtain a green card." The parties agreed at oral argument that the district court made a factual finding that the marriage was a sham marriage or green card marriage, although the judge did not use those terms. These two terms have historically been used to mean the same thing. A sham marriage is "[a] purported marriage in which all the formal requirements are met or seemingly met, but in which the parties go through the ceremony with no intent of living together as husband and wife." Black's Law Dictionary 1120 (10th ed. 2014). A green card marriage is a slang term for "[a] sham marriage in which a U.S. citizen marries a foreign citizen for the sole purpose of allowing the foreign citizen to become a permanent U.S. resident." Black's Law Dictionary 1118-19 (10th ed. 2014). Cases around the country use the terms interchangeably, although clearly the term sham marriage is the broader term and could mean several types of fraudulent or limited-purpose marriages.

As the district judge correctly pointed out, a green card marriage is a felony under federal law. "Any individual who knowingly enters into a marriage for the purpose of

9

evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both." 8 U.S.C. § 1325(c) (2012). It was marriage fraud upon which the district judge's decision was based, not fraud as between the parties as envisioned by K.S.A. 2015 Supp. 23-2702(a)(2).

*There was sufficient competent evidence to conclude that the parties engaged in a sham marriage.*

There was substantial competent evidence to support the district court's finding that the parties engaged in a sham marriage for the sole purpose of allowing Kidane to obtain a green card. The district court had the opportunity to observe Kidane and found that his story that he married Araya for love was not credible. The record contains several pieces of evidence that support this finding. First, the parties visited an immigration attorney before getting married. Second, while Kidane and Araya did sign a lease together there is no evidence that the couple actually lived together. Third, Kidane did not know Araya's daughter's full name, where she went to school, or where she lived. This suggests that Kidane and Araya were not living as a married couple. Araya testified that she married Kidane to help him get his green card, they never lived together, and the marriage was never consummated.

After concluding that the facts support the district judge's finding that this was a sham marriage, the next question we must address is one of first impression—does Kansas recognizes sham marriages as inherently void under K.S.A. 2015 Supp. 23-2702(a)(1), voidable under K.S.A. 2105 Supp. 23-2702(b), or valid and dissolvable only by a divorce?

*Sham marriages are not void under K.S.A. 2015 Supp. 23-2702(a)(1).*

Although this is a matter of first impression in Kansas, other courts have considered the issue of whether sham marriages are void or voidable. When the Utah Court of Appeals first addressed the issue it noted that cases from around the country were not in harmony. See *In re Marriage of Kunz*, 136 P.3d 1278, 1286 (Utah App. 2006). The court's review of the caselaw revealed one court that held that such marriages were void, several that held that the marriages were voidable, and one court that held that the marriages were neither void nor voidable. 136 P.3d at 1286-87.

For example, "[t]he Seventh Circuit has held that sham immigration marriages are void" under Illinois law. 136 P.3d at 1286 (citing *United States v. Lutwak*, 195 F.2d 748, 753-54 [7th Cir. 1952], *aff'd* 344 U.S. 604, 73 S. Ct. 481, 97 L. Ed. 593 [1953]). The Seventh Circuit Court of Appeals reasoned that a sham marriage was "void under the law of this country as against public policy." *Lutwak*, 195 F.2d at 753. Additionally, the Seventh Circuit held that mutual consent is required in every contract, and mutual assent is not achieved "'if the spouses agree to a marriage only for the sake of representing it as such to the outside world and with the understanding that they will put an end to it as soon as it has served its purpose to deceive . . . .'" 195 F.2d at 753.

The Fifth Circuit Court of Appeals, however, stated that "[u]nder Texas law, such a marriage would apparently be only voidable, and would remain valid until annulled." *Ponce-Gonzalez v. Immigration & Naturalization Services*, 775 F.2d 1342, 1347 n. 7 [5th Cir. 1985]); see also *Kleinfield v. Veruki*, 7 Va. App. 183, 188, 372 S.E.2d 407 (1988) (holding that "New Jersey green card marriages must be merely voidable and not void *ab initio*"). The Virginia Court of Appeals also concluded that, under Virginia law, a sham or green card marriage is voidable. *Marblex Design Intern., Inc. v. Stevens*, 54 Va. App. 299, 308, 678 S.E.2d 276 (2009). The Virginia court came to this conclusion after noting that Virginia's statutes explicitly list situations in which marriages are void and that sham

11

marriages are not included. 54 Va. App. at 304. Using the principles of statutory construction, the Virginia court concluded that the legislature's omission of sham marriages from the list of void marriages was intentional. 54 Va. App. at 305-06. Thus, the Virginia court treated the sham marriage as voidable. 54 Va. App. at 308.

The Second Circuit Court of Appeals came to a different conclusion, stating that "New York courts have repeatedly held allegedly 'sham' or 'limited purpose' marriages to be neither void nor voidable, and thus to be dissolvable only by a decree of divorce." *United States v. Diogo*, 320 F.2d 898, 907-08 (2d Cir. 1963). This holding appears to be an outlier. While the Second Circuit did not explain why New York courts rule this way, we note that New York law specifically enumerates when marriages are void and when marriages are voidable. N.Y. Domestic Relations Law, § 6-7 (McKinney 2016). Consistent with courts in other states, the Second Circuit may have been hesitant to hold that a sham marriage is voidable when the legislature expressly declined to do so in its own list of voidable marriages.

After reviewing these decisions from other courts, the Utah Court of Appeals concluded that it would treat sham marriages as voidable. This is because, like in Virginia, "the legislature enumerated specific types of marriages that are void under Utah law and failed to include a sham immigration marriage among them," and the court "construe[d] that omission as intentional." *In re Marriage of Kunz*, 136 P.3d at 1287.

Kansas does not have a single statute that specially enumerates grounds for treating a marriage as void. However, reasons to void a marriage are found in both Kansas statutes and caselaw. See K.S.A. 2015 Supp. 23-2503 (incestuous marriages are void); K.S.A. 2015 Supp. 23-2501 (same-sex marriages are contrary to public policy and are void); K.S.A. 2015 Supp. 23-2502 (common-law marriage contract if either party is under 18 is not "recogniz[ed]"); *State v. Fitzgerald*, 240 Kan. 187, 188, 726 P.2d 1344 (1986) (bigamous marriages are void). The *Fitzgerald* holding, making bigamous

12

marriages void, is premised on a statute that makes bigamy a crime. In criminalizing bigamy, the legislature was expressing its intention to treat such marriages as void. But see *Rosander v. Rosander*, 177 Kan. 45, 49, 276 P.2d 338 (1954) (consensual marriage between an epileptic and another person was not void even though the statute at the time prohibited such a marriage under penalty of imprisonment); *In re Estate of Strohmeier*, 164 Kan. 675, 679, 192 P.2d 181 (1948) (marriage between insane person and another is not void because statute does not declare it void as it does with incestuous marriages). Sham marriages are not specifically listed as void in Kansas. In addition, no Kansas law specifically prohibits sham marriages. Accordingly, we find that even though a sham marriage for the purpose of obtaining a green card may violate federal law, the legislature has not expressed its intent to recognize such marriages as void under K.S.A. 23-2702(a)(1).

*Sham marriages are voidable under K.S.A. 2015 Supp. 23-2702(b).*

Even if the district court was not required to grant an annulment of the Kidane/Araya marriage as void under K.S.A. 2015 Supp. 23-2702(a)(1), the district court had the discretion to grant an annulment "if the contract of marriage was induced by mistake of fact, lack of knowledge of a material fact or *any other reason justifying recission of a contract of marriage*." (Emphasis added.) K.S.A. 2015 Supp. 23-2702(b). In other words, the marriage would be voidable if reasons exist to justify rescinding the contract of marriage. See K.S.A. 2015 Supp. 23-2501 ("marriage contract is to be considered in law as a civil contract between two parties"). The contract of marriage between Kidane and Araya is subject to rescission on at least one ground—it was for an illegal purpose, to fraudulently obtain a green card.

"An illegal contract is a promise that is prohibited because the performance, formation, or object of the agreement is against the law. [Citation omitted.]" *Petty v. City of El Dorado*, 270 Kan. 847, 853, 19 P.3d 167 (2001); see *Zimmerman v. Brown*, 49 Kan.

13

App. 2d 143, 155, 306 P.3d 306 (2013). "'Public policy forbids enforcement of an illegal or immoral contract.'" *Frazier v. Goudschaal*, 296 Kan. 730, 749, 295 P.3d 542 (2013) (quoting *In re Estate of Shirk*, 186 Kan. 311, 326, 350 P.2d 1 [1960]). However, there is no presumption that a contract is illegal. The determination of illegality from the standpoint of public policy depends on the facts and circumstances of the particular case. See *Stewart v. Fourth Nat'l Bank*, 141 Kan. 175, Syl. ¶ 2, 39 P.2d 918 (1935). The public policy relating to marriage "is to foster and protect it, to make it a permanent and public institution, to encourage the parties to live together and to prevent separation." *Ranney v. Ranney*, 219 Kan. 428, Syl. ¶ 2, 548 P.2d 734 (1976).

In the case of a sham marriage the parties have no intention of making their marriage a permanent institution, nor do they plan to live together as husband and wife. In the case of a green card marriage, the sole purpose of the marriage is to commit a fraud on immigration authorities whose duty it is to issue green cards which allow persons to legally remain in the United States. Such a marriage has an illegal purpose which is clearly contrary to public policy. Accordingly, we find that sham marriages are voidable in Kansas under K.S.A. 2015 Supp. 23-2702(b).

We pause to note that whether the marriage is void or voidable has no impact on our decision here. The result is the same. As the Supreme Court recognized in *Fitzgerald*, an annulment has the effect of declaring the marriage relation void ab initio, or from the beginning. 240 Kan. at 189 (quoting *Johnson County National Bank & Trust Co. v. Bach*, 189 Kan. 291, 296, 369 P.2d 231 [1962]). The judgment of annulment gives the voidable marriage the same effect as a void marriage. Even though it is not necessary, a decree of annulment for a void marriage is appropriate for the benefit of the parties. It is "'conducive to good order and decorum and to the peace and conscience of the party seeking it.'" 240 Kan. at 189. So whether a sham marriage is void or voidable, an annulment is the appropriate vehicle for its dissolution.

14

*A reasonable person could agree with the district court.*

Finally, because the decision as to whether the Kidane/Araya marriage should be voided was a discretionary one, we must determine whether the district court abused its discretion.

"Judicial discretion is abused if judicial action is (1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the trial court; (2) based on an error of law, *i.e.*, the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Davisson*, 303 Kan. 1062, 1065, 370 P.3d 423 (2016) (citing *State v. Beaman*, 295 Kan. 853, 865, 286 P.3d 876 [2012]).

We have already determined that the district court did not commit an error of law or an error of fact. We now also conclude that the decision was neither arbitrary, fanciful, nor unreasonable. A reasonable person could agree with the district court. As discussed above, courts in other states allow annulment in situations where the facts support a finding that the marriage was entered into for immigration-related purposes. See *Ponce-Gonzalez*, 775 F.2d 1342; *In re Marriage of Kunz*, 136 P.3d 1278; *Marblex*, 54 Va. App. 299; *Kleinfield*, 7 Va. App. 183. This shows that reasonable people have taken the same view adopted by the district court here. Therefore, the district court did not abuse its discretion in holding that the Kidane/Araya marriage should be annulled.

*The district court did not err by failing to apply the equitable doctrine of clean hands.*

Kidane's final argument is that annulment is an improper remedy for a party with unclean hands. The issue is not addressed in depth in his brief. He cites a couple of maxims regarding equity, but does not analyze the issue beyond that. When an ""appellant fails to brief an issue, that issue is waived or abandoned." [Citations

15

omitted.]'" *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 643, 294 P.3d 287 (2013) (quoting *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 [2002]). However, even if Kidane had fully briefed the issue, his argument would fail.

Kidane cites *Burnett v. Burnett*, 192 Kan. 247, 251, 387 P.2d 195 (1963), for the proposition that "[a]nnulment proceedings are equitable in nature and equitable principles should prevail." Although this was certainly the case when Burnett filed his petition for divorce in 1961, by the end of 1963 when the *Burnett* decision was published, the Kansas Legislature had adopted an annulment statute. L. 1963, ch. 303, sec. 60-1602. Since that time, annulment has been governed by statute, not equity. It is a purely statutory cause of action. Although initially the grounds for annulment were severely limited, in 1983 the current version of the annulment statute was adopted. L. 1982, ch. 152, sec. 2. See K.S.A. 2015 Supp. 23-2702.

The clean hands doctrine is an equitable defense. It bars a party from obtaining "relief in equity with respect to a transaction in which he [or she] has, himself [or herself], been guilty of inequitable conduct." *Green v. Higgins*, 217 Kan. 217, 220, 535 P.2d 446 (1975). The doctrine is not a binding rule, but it may be applied by the district court at its discretion. 217 Kan. at 220. The clean hands doctrine should only be applied to bar relief where a party has acted fraudulently, illegally, or unconscionably. Additionally, application of the doctrine is only appropriate when the misconduct "bear[s] an immediate relation to the subject-matter of the suit and in some measure affect[s] the equitable relations subsisting *between the parties* to the litigation and arising out of the transaction." (Emphasis added.) 217 Kan. at 221.

So even if the equitable defense of the clean hands doctrine applied to a statutory claim, and we decline to find that it does, the court did not abuse its discretion in failing to apply it. There were no inequities between the parties. In fact, Kidane concedes that

16

the testimony was that the parties jointly committed fraud on the government, not on each other. Neither party was induced by fraud. If the district court had applied the doctrine and refused Araya's request for an annulment, then it would have been sending the message that the marriage was valid at its inception. This is counter to what the district court actually found—that the marriage was not valid at its inception. The district court did not want to validate the marriage because the district court viewed it as a fraud by both parties on the federal government, not a fraud committed by one party against another. Annulment was necessary to protect the government from further perpetration of the fraud. Thus, it was reasonable and within the district court's discretion to decline to apply the clean hands doctrine. See *Faustin v. Lewis*, 85 N.J. 507, 512, 427 A.2d 1105 (1981) ("[I]t does not always further the public interest to have equitable defenses act as a per se bar to judicial consideration of questions concerning marital status.").

Affirmed.