NOT DESIGNATED FOR PUBLICATION

No. 126,582

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Estate of CELESTINO ZAVALA-RUIZ.


MEMORANDUM OPINION

Appeal from Wyandotte District Court; KATHLEEN M. LYNCH, judge. Submitted without oral argument. Opinion filed February 21, 2025. Affirmed.

*Aldo P. Caller*, of Overland Park, for appellant.

No appearance by appellee.


Before COBLE, P.J., SCHROEDER and ISHERWOOD, JJ.


PER CURIAM: Celestino Zavala-Ruiz died intestate on July 28, 2020. He was survived by his second wife and five children. His wife, Maria Rosario Zavala, and son, David Zavala Herrera, disputed ownership of several real estate properties for purposes of inclusion in the estate, and litigation between Maria and David ensued. Following a bench trial, the district court concluded that Maria failed to establish that Celestino owned the disputed properties and, as a result, she was not entitled to exercise her spousal elective share against the properties. Maria now appeals the district court's factual determinations regarding ownership, contending its findings are not supported by substantial competent evidence. After a review of the record, we affirm the district court's decision, finding Maria failed to show a sufficient equitable interest in the properties to overcome the presumption of ownership created by the deeds showing her husband never owned any of the subject properties.

1

FACTUAL AND PROCEDURAL BACKGROUND

*Family History and Case Filing*

During his first marriage, Celestino lived in Mexico with his then-wife, Claudia Socorro, with whom he had three sons: David, Celestino Jr. (Junior), and Juan Pablo. Claudia died in 1980, and the family moved to the United States in 1983, settling in Kansas City, Kansas.

Celestino became physically disabled and began receiving Social Security disability benefits sometime in the 1990s. He continued to receive disability payments until his death.

After becoming disabled, Celestino married Maria in 1999, and they had two children together:  Vicky and Felipe. At some point, the family acquired various properties, including a tire shop and several residential properties near the shop. The parties dispute the circumstances under which these properties were acquired. But both parties acknowledge that all revenue-generating properties were cash-only transactions. They also do not dispute that Celestino's name does not appear on any of the deeds related to the properties.

Although none of the deeds to the properties are included in the record on appeal, Maria admits that none of the recorded deeds list Celestino as owner. The deeds to each of the properties were transferred from third parties directly to David, Junior, or Juan Pablo. Celestino's other children were later added to the deeds through various quitclaim deeds. All these transactions were duly recorded with the Wyandotte County Register of Deeds. Vicky intimated that Celestino directed other people to go sign the deeds, and she signed some of the documents.

After Celestino died in July 2020, the relationship between Maria and Celestino's older sons deteriorated. At a "lifting the cross" service—a rosary service for the deceased—Maria and Juan Pablo had a falling out. This confrontation moved over to the tire shop, and eventually Maria threatened to call the police, so Juan Pablo left. Vicky claimed that the threat to call the police was a response to Juan Pablo's threat to hit Maria.

David claimed he had barely talked with Maria since his father's death. He further claimed that Maria posted derogatory comments about her stepsons on Facebook. According to David, Maria had taken over management of the shop when he became ill and entered the hospital in September 2020, after his father's death. David was ill for several months but intended to resume management of the tire shop; however, when he recovered, he found Maria running it. According to David, when Maria took control of the shop, she took the shop keys and has not returned them. David voluntarily left the shop to avoid a confrontation with Maria.

From Maria's perspective, she took over the management of the shop before David became ill, and she claimed neither David nor Juan Pablo had a problem with it until her confrontation with Juan Pablo. Maria, Vicky, and Felipe continued to live in the family home connected to the shop.

In October 2020, Maria filed a petition for issuance of letters of administration of Celestino's estate. Shortly thereafter, David filed a competing petition for informal administration of Celestino's estate, injunction, and temporary restraining orders, seeking to evict Maria from the shop and claiming monetary damages. The court heard testimony over the course of four days during 2021, primarily focused on the properties owned by the family.

*Tire Shop*

David testified regarding his acquisition of the tire shop. He claimed that he went to work for the prior owner of the shop in 1988. Eventually, he took over the shop, first renting the property until he negotiated with the owner to purchase the shop on installments of $500 per month. He paid these installments out of his earnings at the shop. The purchase agreement was not placed in writing. David denied that his father contributed toward the purchase of the shop or contributed physically or financially to its operation. David claimed that his father had no employment after he began receiving disability benefits, and those disability payments were sufficient to support his father, his second wife, and their children, supplemented by income earned by Maria.

The shop property was transferred to David by deed in 1995, which David duly recorded. David claimed he has been the shop's owner since he purchased it and that he has operated it since, except for a couple of years because of health problems, and that he has never worked elsewhere since becoming the owner. David said Juan Pablo and Junior were also owners, but, from the context of his testimony, it is difficult to determine whether he meant they jointly owned the property, the business, or both.

David claimed that he purchased equipment for the shop little by little as he gained earnings. Juan Pablo began working at the shop shortly after David purchased it, though testimony on the timing was inconsistent. David acknowledged his father would commonly hang around the shop, but he denied that his father was involved in running it. He claimed his father just liked to talk with his sons as they worked and with customers. But he contrarily also agreed to being in business with his father at the shop. David admitted that, if he lacked sufficient cash for supplies, he occasionally borrowed from his father, but he also insisted he always repaid his father. David asserted that he primarily paid the business bills and employee wages, but he occasionally gave one of his siblings cash to pay bills. David presented evidence that he had paid the Kansas retailers' sales tax

4

for the shop, and filed tax returns indicating that he was the owner of the tire shop. He did not keep documentation of wages and paid employees in cash. David claimed to maintain a record of the income and expenses of the shop in a ledger and said he was the only person to enter information into the ledger. He claimed he locked up the shop at night and opened in the morning.

David both claimed that Maria never worked in the shop and that she worked in the shop when he went to Mexico after Celestino went to prison. He testified that Celestino called him from prison to inform him that Maria would be in charge. But David characterized the conversation as a suggestion with which he approved. David claimed he then resumed control of the shop operations when he returned, but, contrary to his prior testimony, he testified that Maria continued to work at the shop. He denied that he had an informal agreement to give Maria management of the shop, even temporarily, or to permit her to be at the shop in his absence.

In contrast, Maria claimed that Celestino purchased the tire shop. She acknowledged that Celestino owned the tire shop before they were married. She also acknowledged that David and Juan Pablo worked at the shop but suggested they were merely their father's employees. Maria claimed that Celestino always managed the tire shop and purchased the things needed to run the shop. She recognized David paid the occupational taxes but insisted that Celestino gave him the money and directed him to pay the taxes. Her attorney presented David with some merchandise bearing the tire shop's name and address but listing Celestino and his phone number. David had no explanation for Celestino's name on merchandise associated with the tire shop.

Maria claimed that, after Celestino became sick or when he visited Mexico, David and Juan Pablo turned over the proceeds from the tire shop to her, and she managed the accounts. She continued to manage the tire shop after Celestino's death. She denied ever barring David from working at the shop, but she admitted that she had not shared any of

the shop income with David or Juan Pablo. Maria admitted to not yet filing a 2020 income tax return claiming income from the shop after Celestino died.

The parties agree that Celestino never performed any physical labor at the tire shop due to his disabilities. But to support their competing claims of ownership, David and Maria each presented witnesses to testify regarding the daily operation of the tire shop, the collection of shop income, and the payment of shop expenses.

For example, Larry Mortenson, an automotive parts supplier, testified that his business had been serving Zavala Tire Shop for 20 years. Mortenson said that David ran the tire shop most of the year and Juan Pablo ran the shop when David visited Mexico once a year. Mortenson indicated that most of his business interactions at the shop involved either David or Juan Pablo. Mortenson, however, also conceded that he discussed the tire shop's needs with Celestino. He talked with David or Juan Pablo about purchases only when Celestino was unavailable. Celestino was never working in the shop, but he was always hanging around in the office or just outside the shop. Before Celestino went to prison, Mortenson had never met Maria. When Celestino went to prison and after he was hospitalized, however, Maria would be Mortenson's contact person to discuss the shop's supply needs. Mortenson also stated that Maria seldom paid for supplies early in the business relationship, but, since about a month after Celestino's death, Maria always made the payments. During this same time, Mortenson stopped seeing David or Juan Pablo at the shop.

But Kevin Mundy, another supplier for the tire shop, testified that he primarily had a business relationship with Celestino. He claimed that Celestino had operated the Zavala Tire Shop since 1994 or 1995. Mundy characterized David as the shop manager. Mundy claimed Celestino would order tools or repairs for shop machinery and pay Mundy on "handshake" credit. He said he typically dealt with Celestino personally when he visited the shop. Mundy assumed Celestino was the business owner because David and Juan

6

Pablo always sought Celestino's approval for any purchases. Mundy believed Juan Pablo and David were untrustworthy. But Mundy also admitted that either David or Juan Pablo came to his office to make payments on equipment bought on credit. When Celestino went to prison, Mundy discussed purchases and repairs with Vicky, not with Maria. Since Celestino had died, the shop had placed no new orders, but the shop was current on its accounts with Mundy's company.

*Family Residence*

The home directly next to the shop was the family residence. The family purchased it from Mary Lou Rodriguez in June 2000. No one disputes that the deed reflects a conveyance from Rodriguez to David, but Rodriguez testified she sold the property to Celestino, who made installment payments to her. Maria also testified that Celestino purchased the residence through cash installment payments. Rodriguez did not remember a deed and did not know why David's name appeared on the title. David claimed to have purchased the property himself for $35,000 in cash installments, though Rodriguez denied ever receiving payments from him. Celestino and Maria moved into the property while Rodriguez was still living there, but Rodriguez could not recall whether other members of the family lived with them.

The parties' conflicting testimony regarding the residence continued through trial. The property was connected to the shop by a covered walkway, which Maria claimed Celestino paid to have built, and David had nothing to do with the project. Though David claimed ownership of this property, he stated that he had an agreement with Maria to permit her to remain at the residence for several years. They did not have a contract, but David claimed he allowed the family to live at the residence for 20 years without paying rent. He said he moved to another residence voluntarily when his father asked him to move because Vicky was old enough to need her own room. But Maria testified that David moved out of the family home only when Celestino ordered him to do so. She also

7

denied any agreement with David to permit her to remain in the residence because she disputed that David had purchased the property.

*Rental Properties*

In addition to the tire shop and family residence, the family acquired other residential properties used as income generating rentals. David claimed he slowly acquired the other residential properties with proceeds from the shop, and these transactions were also oral agreements, paid for with cash installments. He claimed the residential properties were in disrepair and so he restored them. David claimed that he negotiated the rental agreements with the tenants. Before Celestino died, rental payments for these properties were paid to David or Juan Pablo. David testified that Maria only took over managing the rental properties when he became sick after Celestino's death and she has continued to collect rental payments from the tenants. David has received no rental payments since he became ill.

Maria claimed, however, that Celestino paid for each of these properties. Like David, she testified the purchase agreements were oral and Celestino made installment payments in cash for each purchase as the properties became available. Celestino would hire someone to restore the properties and then rent them. Maria claimed that Celestino wanted to title everything in his own name and changed his mind about titling a truck in Maria's name. Vicky also claimed to help her father with managing his bank accounts and collecting rent. She always gave the rental payments to her father.

As with the tire shop, David and Maria each presented competing evidence regarding the maintenance of and rent collection from each of the residential properties. For instance, Miguel Villa was a tenant of one of the rental properties and helped at the tire shop for "tips," and his testimony generally supported that Celestino was the leader of both the rental properties and the tire shop. Villa claimed that Celestino offered to let him

8

live rent-free if he helped to restore the basement of one of the rental properties. He testified that he was a roommate of David and Juan Pablo, and he only saw renters pay rent to Celestino, never to David. Villa viewed Celestino as his boss before his death, and since then, Villa had been working at the shop full-time for Maria. Villa denied that David or Juan Pablo had any greater authority for business decisions at the shop than Villa had. He claimed that Celestino left David in charge of the shop when Celestino went to Mexico, but David had to turn over the cash receipts to Maria. Villa said that Maria frequently helped in the shop, with cleaning and sweeping and other activities. She helped run the shop when Celestino became ill and when he was in prison. Vicky also helped with paying bills. Villa denied that David or Juan Pablo ever paid him for his work at the shop.

Francisco Javier Hernandez was a former tenant of one of the disputed properties. He testified he rented the house from Celestino for $650 per month. Hernandez claimed that they had a written agreement, but Maria's attorney did not produce an agreement. Hernandez admitted that he paid his rent in cash only to Celestino. Hernandez did not understand his rental agreement to be with David or Juan Pablo. Hernandez also believed the tire shop belonged to Celestino because Celestino told him as much. He believed David and Juan Pablo were merely employees of the shop.

Another renter, Abraham Hernandez, also testified. He had an oral rental agreement with Celestino for slightly over $200 per month. Hernandez never paid rent to David or Juan Pablo. He also worked part-time at the tire shop for "tips." Hernandez understood that Celestino owned all the properties. He said that David and Juan Pablo simply worked at the shop and sometimes stole from Celestino by failing to turn over all the shop proceeds. As far as Hernandez knew, David had no authority over the other employees, and when Celestino went to prison, Maria ran the tire shop.

*District Court's Decision*

Following the four days of trial testimony, the district court reviewed written arguments presented by the parties before issuing a memorandum decision on January 28, 2022.

The district court denied Maria's petition for issuance of letter of administration, noting that Maria claimed only an equitable interest in the subject properties. Because there was no evidence that Celestino ever had legal title to the properties, the court found the relevant provisions of the Kansas Probate Code failed to entitle Maria to any of the properties. The court dismissed David's request for injunctive relief and damages as improper in a probate proceeding and ordered both parties to pay their respective attorney fees.

Maria filed a motion for new trial, which the district court ultimately denied. Maria timely appeals.

### WAS THE DISTRICT COURT'S CONCLUSION THAT MARIA FAILED TO ESTABLISH HER RIGHT TO A SPOUSAL SHARE OF SEVERAL PROPERTIES SUPPORTED BY SUBSTANTIAL COMPETENT EVIDENCE?

The parties do not dispute that Celestino died intestate. Accordingly, his property passes to his heirs as provided in the intestate succession statutes of the Kansas Probate Code. K.S.A. 59-502 et seq. Under those statutes, a surviving spouse is entitled to one-half of all real estate owned by the decedent during the marriage.

> "Except as provided further, the surviving spouse shall be entitled to receive one-half of all real estate of which the decedent at any time during the marriage was seized or possessed and to the disposition whereof the survivor shall not have consented in writing, or by a will, or by an election as provided by law to take under a will, except such real estate as has been sold on execution or judicial sale, or taken by other legal proceeding.

10

> The surviving spouse shall not be entitled to any interest under the provisions of this section in any real estate of which such decedent in such decedent's lifetime made a conveyance, when such spouse at the time of conveyance was not a resident of this state and never had been during the existence of the marriage relation. The spouse's entitlement under this section shall be included as part of the surviving spouse's property under K.S.A. 59-6a207, and amendments thereto." K.S.A. 59-505.

The term "seized or possessed" has legal significance in property law and means seizin (ownership). See K.S.A. 58-2201 ("All persons owning lands not held by adverse possession, shall be deemed to be seized and possessed of the same."). As used in K.S.A. 59-505, the term does not establish a rule of inheritance but recognizes that, in Kansas, a spouse owns half of all real estate titled in the decedent's name. See *Jackson v. Lee*, 193 Kan. 40, 43, 392 P.2d 92 (1964) ("[W]e can agree that G.S. 1949, 59-505, which gives one-half of the realty of which one spouse is seized or possessed during the marriage to the other spouse, is not a statute of inheritance. The interest which the statute gives one spouse in the real estate of the other comes into existence by operation of law upon the concurrence of seizin and the marriage relation. The widow takes not as an heir of her husband under this statute but as her separate and absolute property in fee simple.").

A spouse's right to claim property in a decedent's estate was expanded with the spousal elective share provisions of K.S.A. 59-6a201 et seq. In Kansas, the spouse's elective share applies to testate and intestate estates. *In re Estate of Antonopoulos*, 268 Kan. 178, 181, 184, 993 P.2d 637 (1999). The spouse's elective share hinges on a determination of the "augmented estate," which combines all assets of the decedent and surviving spouse. See K.S.A. 59-6a203.

Under K.S.A. 59-6a205, certain nonprobate transfers of property are included in the augmented estate and encompass the following relevant transfers of property:

11

"(a) Property owned or owned in substance by the decedent immediately before death that passed outside probate at the decedent's death. . . .

. . . .

"(b) Property transferred in any of the following forms by the decedent during the marriage:

(1) Any irrevocable transfer in which the decedent retained the right to the possession or enjoyment of, or to the income from, the property if and to the extent that the decedent's right terminated at or continued beyond the decedent's death. The amount included is the value of the fraction of the property to which the decedent's right related, to the extent that such fraction of the property passed outside probate to or for the benefit of any person other than the decedent's estate or surviving spouse.

. . . .

"(c) Property that passed during marriage and during the two-year period next preceding the decedent's death as a result of a transfer by the decedent if the transfer was of any of the following types:

. . . .

(3) Any transfer of property, to the extent not otherwise included in the augmented estate, made to or for the benefit of a person other than the decedent's surviving spouse. The amount included is the value of the transferred property to the extent that the aggregate transfers to any one donee in either of the two years exceeded $10,000." K.S.A. 59-6a205(a), (b) and (c).

But none of these subsections in K.S.A. 59-6a205 clearly apply to Maria's claim without evidence of Celestino holding legal title to any of the properties at any time. And Maria does not claim a constitutional or statutory homestead right.

In the district court and on appeal, Maria claims an equitable ownership interest in the disputed properties. The record demonstrates that Celestino held no legal interest in the property. So, Maria's interest must derive, if at all, from an equitable ownership interest held by Celestino in each of the properties.

Consistent with the theory of equitable relief, the person seeking equity has the burden of establishing sufficient facts to justify the allowance under equitable considerations. *Quesenbury v. Wichita Coca Cola Bottling Co.*, 229 Kan. 501, 504, 625 P.2d 1129 (1981). Relevant to this discussion, Maria has never expressed a specific theory for Celestino's equitable ownership in the disputed properties. She presented no evidence of a trust. See *Redmond v. Kester*, 284 Kan. 209, 216, 159 P.3d 1004 (2007) (finding equitable interest created by inter vivos trust sufficient to claim homestead exemption). She has not discussed the elements of fraud necessary for the imposition of a constructive trust. See *Hack v. Novak*, No. 98,086, 2008 WL 2251186, at *5 (Kan. App. 2008) (unpublished opinion) ("[O]ur Supreme Court and this court have consistently held that fraud must be proven before a constructive trust will be imposed, unless a party is claiming an interest in insurance proceeds."). She did not demonstrate that Celestino owned a legal interest in the properties but transferred them in a manner that was inequitable to her. See *Estate of Church v. Atkinson*, No. 71,466, 1994 WL 17121063, at *3-4 (Kan. App. 1994) (unpublished opinion) (finding an equitable interest in favor of deceased ex-wife who had been awarded real property in divorce proceedings years before the son registered a deed of transfer from his father).

The application of equity by a district court rests within the sound discretion of the court. *Harms v. Burt*, 30 Kan. App. 2d 263, 266, 40 P.3d 329 (2002). Judicial discretion is abused when the court's decision exceeds the bounds of the appropriate legal framework, fails to account for the relevant facts, or constitutes arbitrary, fanciful, or unreasonable conduct. See *State v. Peters*, 319 Kan. 492, 497, 555 P.3d 1134 (2024). The party alleging an abuse of discretion bears the burden of establishing such abuse. 319 Kan. at 497-98.

On appeal, Maria does not claim that the district court failed to follow any specific principle of law. She claims only that the district court's findings concerning her equitable interest were not supported by substantial competent evidence. Substantial

13

competent evidence is such legal and relevant evidence that a reasonable person might regard as sufficient to support a conclusion. *State v. Rinke*, 313 Kan. 888, 892, 491 P.3d 1260 (2021). An appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 313 Kan. at 892. Yet Maria's appellate argument essentially asks this court to reweigh the evidence presented at trial by contending that David's evidence was not credible and that the overwhelming weight of the evidence favored a conclusion that Celestino controlled the disputed properties, despite what the deeds showed.

Although the district court's factual findings in its written decision are somewhat thin, Maria's argument mischaracterizes the court's ruling. In entering judgment in favor of David, the district court did not conclude that David's evidence regarding operating the shop and collecting rent was necessarily more credible than Maria's evidence. Instead, the district court found that Maria had not presented a legal theory authorizing the court to look past the ownership interests recorded in the deeds. In other words, the district court essentially concluded that Maria had failed to carry her burden of establishing that Celestino retained an equitable interest in the disputed properties:

> "There was conflicting testimony from numerous witnesses about who ran or was in charge of the tire shop. Other witnesses testified that they took direction from Celestino about repairs to the individual properties. Celestino and sometimes others collected rent from the properties. David and Juan Pablo lived in one of the properties. However, these facts do not establish ownership of property. Neither party presented evidence showing a contract between the owner and the person leasing the property.
>
> "Ownership of real estate is evidenced and recorded by deed. The only ownership documents presented record David Zavala and his siblings as owners of all real estate in question. K.S.A. 58-2201 states, 'All persons owning lands not held by an adverse possession, shall be deemed to be seized and possessed of the same.' The property deeds noted David Zavala and his siblings [as] owners at all times. David Zavala complied with the statutory requirements to purchase the property, convey an interest to his siblings, and

14

record the same with the register of deeds. Maria did not dispute that the deed contains the names of David Zavala and his siblings. She explained this fact by saying that her husband put the names on the title. However, there is no proof that Celestino purchased the properties. There are no bills of sales or receipts. The only evidence is [that] the conveyance[s] [were] from the owner[s] to David Zavala."

The district court's conclusion is tantamount to a negative finding regarding Maria's burden of proof. See *In re Estate of Rickabaugh*, 305 Kan. 921, 936, 390 P.3d 19 (2017) (applying standard of review for negative finding when party seeking to revoke a will failed to carry his burden of proof).

> "In the absence of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice, the negative finding of a district court will not be disturbed on appeal. An appellate court may not nullify a district court's disbelief of evidence, nor may it determine the persuasiveness of evidence that the district court may have believed." 305 Kan. at 935.

As the district court noted, the dispute at trial centered on who exercised control of the disputed properties and who retained the benefits, but for purposes of establishing an equitable interest in the property, these factors are not conclusive. The district court simply did not believe that Maria's evidence established an ownership interest in the property sufficient to overcome the presumption created by the legal title.

Even if this court could reweigh the evidence and adopt Maria's version of events—which it is not authorized to do—Maria's evidence demonstrated that, while Celestino may have retained control of the property and the benefits thereof, he intentionally divested himself of the hallmarks of ownership. Celestino placed the properties in the names of his children. His children's names were on the tax rolls. Celestino never claimed profits from the shop or the rental properties on his income taxes. He insisted on payments in cash. Celestino carefully avoided a paper trail that

would indicate he retained any ownership interest in any of the properties. The record suggests that he did so to avoid claiming income from the tire shop or the rental properties, thus to avoid reducing or eliminating his social security disability payments. In fact, Maria admits as much in her appellate brief: "Maria Rosario contends that [Celestino] did so with intent to avoid declaring income or assets that would have reduced or stopped his social security disability benefits, and to at the same time, provide for inheritance for his children."

By seeking to place legal title to the properties in the names of his children to avoid reporting income, Celestino is not entitled to equity. See *Green v. Higgins*, 217 Kan. 217, 220, 535 P.2d 446 (1975) ("The clean hands doctrine is based upon the maxim of equity that he who comes into equity must come with clean hands. The clean hands doctrine in substance provides that no person can obtain affirmative relief in equity with respect to a transaction in which he has, himself, been guilty of inequitable conduct."). By concealing his true ownership interests in the properties to avoid reporting income to the Social Security Administration, Celestino essentially committed fraud. See *In re Marriage of Kidane and Araya*, 53 Kan. App. 2d 341, 354, 389 P.3d 212 (2017) (acknowledging "clean hands" doctrine regarding fraudulent marriage with respect to immigration but denying application because the doctrine did not apply to a statutory claim and because the misconduct did not have an immediate relation to the equitable relationship between the parties to the litigation).

Here, Maria's claim depends on the existence of Celestino's equitable interest in the property. She must claim equity on behalf of her deceased husband. But Celestino is not entitled to equity when he divested himself from legal ownership of the disputed properties to defraud the government and retain his full disability benefits.

While Maria may not have been directly involved in the decisions regarding the paperwork for the properties, she knew about Celestino's disability payments and that he

16

was limited in the amount of income he could claim and retain those benefits. Because Maria's interest is inextricably tied to any equitable interest Celestino possessed, she is not entitled to any equitable relief against the legal title holders—in this case, Celestino's children.

Maria claims that Celestino was the owner of all these properties. But he was not the legal owner of any of these properties. So, Maria must rely on equity to prosecute her claim. A party seeking to establish an equitable claim to real property bears the burden of establishing the claim. *Quesenbury*, 229 Kan. at 504. The district court concluded that Maria failed to establish a sufficient equitable interest in the properties to overcome the presumption created by the deeds. For the above reasons, we must agree.

Affirmed.